Nazareth GATES et al., Plaintiffs-Appellees,
and
United States of America, Plaintiff-Intervenor-Appellee,

v.

John COLLIER, Superintendent, Mississippi State Penitentiary, et al., Defendants-Appellants.

No. 73–1023.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1974.

---

See also 5 Cir., 489 F.2d 298.

1294

A. F. Summer, Atty. Gen., William A. Allain, P. Roger Googe, Jr., Asst. Attys. Gen., Jackson, Miss., for defendants-appellants.

H. M. Ray, U. S. Atty., Oxford, Miss., Michael Davidson, Jesse H. Queen, Thomas R. Sheran, Dept. of Justice, Civil Rights Div., Washington, D. C., for intervenor.

Roy S. Haber, Native American Rights Fund, Boulder, Colo., George Peach Taylor, Frank R. Parker, Jackson, Miss., Edward J. Reilly, New York City, for plaintiffs-appellees.

Before TUTTLE, BELL and GOLDBERG, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal by the Superintendent of the Mississippi State Penitentiary, members of the Mississippi Penitentiary Board, and the Governor of the State of Mississippi, challenges the nature and extent of the equitable relief granted by the district court which required major physical facility renovations and administrative reforms at the Mississippi

State Penitentiary, at Parchman, Mississippi (hereinafter Parchman). The district court made extensive findings of fact and conclusions of law, reported in Gates v. Collier, 349 F.Supp. 881 (N.D. Miss.1972). The decision held that the conditions and practices in the maintenance, operation and administration of Parchman deprived inmates of rights secured by the First, Eighth, Thirteenth and Fourteenth Amendments and by 42 U.S.C.A. §§ 1981, 1983, 1985 and 1994, and granted injunctive and declaratory relief for the plaintiffs.

The decision of this Court has been withheld pending a decision by the Supreme Court in the case of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, 1974, a case which dealt with some of the issues here on appeal.

The inadequateness of the Parchman prison facilities and its "trusty" personnel system as practiced are well established by the fact that the Governor of Mississippi forthrightly conceded the existence of constitutional violations in the Parchman operations: "We are, in effect, Your Honor, admitting that the constitutional provisions have been violated." The Governor asked the court: "Isn't there enough of the incriminating facts in these depositions and interrogatories to give the Court adequate grounds to find a conclusion of fact that the First Amendment and all other constitutional provisions have been violated . . . ?" A consultant committee engaged by the Mississippi State Planning Agency, the Law Enforcement Assistance Administration (LEAA) and the American Correctional Association concluded that present conditions at Parchman are "philosophically, psychologically, physically, racially and morally intolerable." The district court's abstract of the findings of fact about the conditions and practices at Parchman paints a shocking picture.

We proceed to summarize the structure of the decision, to examine whether any issues in this case must be initially considered by a statutory three-judge court, to review the court's determination of the merits, and to discuss why we reject the appellants' contention that the relief was too "sweeping."

## I. SYNOPSIS OF DISTRICT COURT'S ORDER

This action was commenced on February 8, 1971, by two overlapping classes of plaintiffs. The first class consisted of *all* inmates confined at Parchman, while the second class was comprised of *black* inmates whose grievances included racial discrimination and segregation, as well as deprivation of the broad range of rights claimed by the first class. A motion by the United States to intervene in this suit pursuant to 42 U.S.C.A. § 2000h–2 was granted on August 23, 1971. Thereafter, the parties conducted protracted pre-trial discovery proceedings. On May 11, 1972, four days before trial, counsel for all parties agreed to waive presentation of evidence in open court and to submit the case on the record including pleadings, stipulations, depositions, interrogatories and answers, offers of proof, factual summaries, proposed trial plans, evidentiary synopses, photographs, exhibits, reports and other documentary evidence assembled by the parties. All of these items were admitted into evidence, defendants stipulating that they would not contest the facts set forth therein. Findings of fact and conclusions of law were issued by the district court on September 12, 1972, but judgment was reserved pending a hearing on the proper form and measure of relief to be granted.

Beginning on October 16, 1972, the district court held a two day hearing to solicit testimony from all interested parties and tehnical experts in order to assist its fashioning an appropriate judgment. Representatives of the LEAA advised the court that federal funds were available to aid the improvement of the conditions at Parchman. In the decision rendered on October 20, 1972, the district court divided its injunctive relief into two parts: (A) immediate and intermediate and (B) long-range.

The (A) immediate and intermediate relief was directed towards (1) the elimination of unconstitutional censorship of prisoner mail; (2) the establishment of definite and constitutionally permissive rules and regulations regarding inmate discipline; (3) the prohibition of any form of corporal punishment of such severity as to offend present day concepts of human dignity; (4) the ban against use of disciplinary segregation or isolation at the Maximum Security Unit except under conditions which would satisfy the requirements of the cruel and unusual punishment clause; (5) the improvement of medical facilities and staff; (6) the institution of reasonable procedures to protect inmates from assault by fellow inmates; (7) the abolition of the trusty system insofar as it utilizes trusties in custodial positions; (8) and certain renovations in the physical facilities involving health hazards at Parchman.

Regarding the (B) long-range relief, the court ordered the defendants to submit "a comprehensive plan for the elimination of all unconstitutional conditions in inmate housing, inadequate inmate housing, inadequate water, sewer and utilities, inadequate fire fighting equipment, inadequate hospital and other structures condemned by this court."

## II. NECESSITY OF A THREE-JUDGE COURT

At the outset, we must determine whether any questions in this case should have been presented initially to a statutory three-judge court. This task is imperative in light of the recent decision of this Court sitting en banc in Sands v. Wainwright et al., 491 F.2d 417 (5th Cir. 1974), which consolidated for opinion purposes four cases concerning inmates' rights in state prisons. *Sands et al.* held that 28 U.S.C. § 2281 requires the empanelling of a three-judge court if the action to be enjoined is authorized by statewide prison regulations.

■ However, having examined the issues in the en banc litigation we conclude that this law suit although similarly involving statewide prison regulations is presented in a significantly different posture, so as to preclude the necessity of a three-judge court. As we have already noted, the Governor of the State of Mississippi conceded the unconstitutionality of the practices and conditions at Parchman. For the following reasons this factor in the case at bar substantially distinguishes its framework from *Sands et al.* and precludes a finding that a substantial constitutional question is in controversy in this case, a prerequisite to empanelling a three-judge court.

In *Sands et al.* this Court thoroughly reviewed the decisions having either an expansive or limiting impact on the application of the three-judge court statute, 28 U.S.C. § 2281.[1] As outlined in the en banc opinion, one limiting doctrine is

"the rule that a three-judge court need not be convened when either the constitutional attack on the State statute or regulation is insubstantial, Ex parte Poresky, 1933, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152, or the constitutional defense is frivolous, Bailey v. Patterson, 1962, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512." *Sands et al., supra*, 491 F.2d at 422.

Ex parte Poresky also teaches us that:

"the question may be plainly insubstantial, either because it is 'obviously without merit' or because 'its unsoundness so clearly results from the

---

1. 28 U.S.C. § 2281 states:
 "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by administrative board or commission acting under

State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

previous decisions of this Court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.' " 290 U.S. at 32, 54 S.Ct. at 4.[2]

The only problem is that the test for determining the substantiality of the constitutional question elucidated in Ex Parte Poresky, *supra*, does not afford a formula which can be applied to a particular case with mathematical precision. *See* Green v. Board of Elections of City of New York, 380 F.2d 445, 448 (2d Cir. 1967). Fortunately, another Supreme Court decision, Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962), further clarified this test. In *Bailey* plaintiffs sought to enforce their rights to non-segregated transportation, allegedly refused them under color of state statutes. On appeal from an abstention order of a three-judge court, the Supreme Court held that the case was one for a single judge. Stressing that prior decisions had settled beyond argument that statutes requiring segregation of transportation were unconstitutional, the Court held:

> "Section 2281 does not require a three-judge court when the claim that a statute is unconstitutional is wholly insubstantial, legally speaking nonexistent. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152; Bell v. Waterfront Comm'n, 2 Cir., 279 F.2d 853, 857–858. *We hold that three judges are similarly not required when, as here, prior decisions make frivolous any claim that a state statute on its face is not unconstitutional.* Willis v. Walker, D.C., 136 F.Supp. 181; Bush v. Orleans Parish School Board, D.C., 138 F.Supp. 336; Kelley v. Board of Education, D.C., 139 F.Supp. 578. We

denied leave to file petitions for mandamus in *Bush*, 351 U.S. 948, 76 S.Ct. 854, 100 L.Ed. 1472, and from a similar ruling in Booker v. Tennessee Board of Education, 351 U.S. 948, 76 S.Ct. 856, 100 L.Ed. 1472. The reasons for convening an extraordinary court are inapplicable in such cases, for the policy behind the three-judge requirement—that a single judge ought not to be empowered to invalidate a state statute under a federal claim—does not apply. The three-judge requirement is a technical one to be narrowly construed, Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800." *Id.* at 33, 82 S.Ct. at 551. (Emphasis supplied).

The import of the *Bailey* decision was to make it clear that a substantial constitutional question was not in controversy, not only when the claim was simply a frivolous attack on the constitutionality of a statute, but also when the unconstitutionality of a statute was obvious.

It is further significant that Professor Currie in his often cited article "The Three Judge District Court in Constitutional Litigation," 32 Chi.L.Rev. 1, 64–65 (1964), surmised that:

> "[t]his somewhat startling decision [Bailey v. Patterson, *supra*] had been foreshadowed by several opinions from the Fifth Circuit where confronted with great numbers of segregation cases all presenting the same, already decided question, the courts were understandably eager to avoid the burden of so many extraordinary benches. *E. g.*, Board of Supervisors v. Tureaud, 225 F.2d 434, 446 (5th Cir. 1966) (Rives, J., concurring)."

2. For other decisions adopting this precise test for determining the existence of substantial constitutional questions see Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1972) ; Swift Co., Inc. v. Wickham, 382 U.S. 111, 115, 86 S.Ct. 258, 15 L. Ed.2d 194 (1965) ; Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962) ;

California Water Service Co. v. City of Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 82 L. Ed. 1323 (1938) ; Kline v. Rankin, 489 F.2d 387 (5th Cir. 1974) ; Local No. 300, Amal. Meat Cutters & B. Work. v. McCulloch, 428 F.2d 396 (5th Cir. 1970) ; Mayhue's Super Liquor Store, Inc. v. Meiklejohn, 426 F.2d 142, 144 n. 4. (5th Cir. 1970).

Continuing his exposition on the impact of *Bailey*, Professor Currie also stated:

"Perhaps as when the invalidity of the statute is conceded there is no plausible claim of authorization by a 'statute.'" *Id.* at 65.

At another juncture in the article, footnote 222, the principle is reiterated in this manner:

"Again, three judges are not required if the defendants concede the unconstitutionality of the statutes, for in substance this too is to disclaim reliance on a statute. Gibson v. Board of Pub. Instruction, 170 F.Supp. 454, 457 (D.Fla.1958); McKissick v. Durham Bd. of Educ., 176 F.Supp. 3, 12 (M.D.N.C.1959)."

In addition in Gibson v. Board of Pub. Instruction, 170 F.Supp. 454 (S.D.Fla. 1958), the court held that the Florida statute in question obviously violated the constitution under the *Brown* decision, pointing out that all parties *conceded* this fact. No discussion was necessary; the court simply stated: "All parties concede this fact. A three-judge court, in this case, is not required," citing Bush v. Orleans Parish School Board, 138 F.Supp. 337 (E.D.La.1956); Carson v. Warlick 238 F.2d 724 (4th Cir. 1956); Kelley v. Board of Education of Nashville, 139 F.Supp. 578 (M.D.Tenn.1956), aff'd., 270 F.2d 209 (6th Cir. 1959).

Two other decisions referred to in *Bailey* are noteworthy: Willis v. Walker, 136 F.Supp. 181 (W.D.Ky.1955) and Kelley v. Board of Educ., 139 F.Supp. 578 (M.D.Tenn.1956). The plaintiffs in Willis v. Walker, *supra,* challenged the constitutionality of a state statute and constitutional provision authorizing segregation; the defendants "freely conceded" that such constitutional and statutory provisions were invalid by reasons of the Supreme Court's decision in Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Similarly, in Kelley v. Board of Educ., *supra,* a desegregation case controlled by *Brown,* the court held that there was no necessity for a three-judge court, since

the unenforcibility of the constitution and statutes has been "conceded" by the defendants.

■■ Therefore, it has become settled that to justify convening a three-judge court it must appear that the constitutional question is a reasonably debatable one, and if the point raised in support of the allegation of unconstitutionality is one already determined by the Supreme Court, this precludes constitutional questions from being regarded as substantial. Another corollary of this principle is that if the parties concede the unconstitutionality of a statute or regulation or practice, there is no room for inference that the constitutional question raised is to be the subject of the controversy. Therefore, the question of the constitutionality of a given act may be insubstantial because previous decisions have either upheld or outlawed the act, or, as we hold here, because the parties have conceded the unconstitutionality of all of the alleged acts whether authorized by statute or regulation or merely practiced.

■ Just as the law became well-defined in the school desegregation suits, so progress the prisoner rights cases based on the conditions of inmate habitation and practices of prison administration. Apparently, the Governor of Mississippi, in recognition that Parchman was operated in such an unacceptable manner, chose to concede the unconstitutionality of the conditions and practices. The defendants on appeal to this Court only challenged the extent of the relief granted, and *disputed neither the questions of fact nor conclusions of law* made by the district court. Neither did the defendants urge the empanelling of a three-judge court. Of course, such a failure could not confer jurisdiction; but here there was simply no substantial constitutional issue in controversy. All agreed on the unconstitutionality.

■ In conclusion, based on these decisions interpreting section 2281, we hold that, since the Governor of the State of Mississippi conceded the uncon-

stitutionality of the practices and conditions at Parchman, no substantial constitutional question is in controversy in this case.

### III. MERITS OF THE PRISONERS' COMPLAINTS

Having resolved that none of the issues in this case must initially be heard by a three-judge court, we proceed to review the district court's adjudication on the merits. The sole argument on appeal is that the state lacks the financial ability to implement the district court's order within the time schedule designated, and that therefore, the court exceeded its jurisdiction in ordering the total elimination of the armed trusty system, the improvement of the physical facilities, the classification of inmates, the implementation of inmate protection procedures, and emendation of medical facilities. More specifically, the appellants' argument is that after the entry of the judgment they immediately promulgated conforming rules and regulations concerning the censorship of mail, use of corporal punishment, the discipline of inmates, and disciplinary confinement, but lacked the funds to effectuate the other portions of the judgment in accordance with the time guidelines specified. It is important to note that the appellants do not challenge, for example, the court's holding that equal protection requires reclassification of the inmates on a basis other than race or that the Eighth Amendment requires improvements in the physical and medical facilities at Parchman and the elimination of the trusty system. The appellants did not deny the unconstitutionality of their previous operation and administration of Parchman and do not now controvert the constitutional mandate for the reforms ordered. Rather their sole argument is that they do not have the financial capacity to effectuate these reforms. To reiterate, appellants do not challenge a single finding of fact or conclusion of law by the trial court.

However, in order to evaluate the issues here it is necessary to consider the threshold question of whether the district court, given the concession of the unconstitutionality of the current practices at Parchman, correctly determined to what extent changes in Parchman's facilities and administrative practices must be effectuated in order to meet constitutional standards, and, then, secondly, to determine whether fund shortage may require a modification of the district court's judgment regarding these matters. Each component of the district court's judgment regarding these matters will be individually examined. It should be repeated that none of the district court's findings of fact is disputed by the appellants. We simply adopt those findings throughout our discussion. The severest criticisms that follow are in the words of the trial court.

#### A. *Elimination of Racial Segregation and Discrimination:*

■■ The practice at Parchman has been and is to maintain a system of prison facilities segregated by race through which black inmates are subjected to disparate and unequal treatment. Blacks are housed in more crowded quarters than whites, are assigned to different work details, are denied the same vocational training opportunities and are punished and disciplined more severely than whites for the same offense. Undoubtedly the appellants' policy of segregating inmates in housing facilities, unrelated to prison security and discipline, is in violation of the equal protection clause of the Fourteenth Amendment. We need not labor the point that a State may not constitutionally require segregation of public facilities, Johnson v. Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963), and the principle is as applicable to jails as to other public facilities. Lee v. Washington, 263 F.Supp. 327 (M.D.Ala.1966), aff'd., 390 U.S. 333, 334, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); United States v. Wyandotte County, Kansas, 480 F.2d 969 (10th Cir. 1973). As reiterated by the Supreme Court in Cruz v. Beto, 405 U.S.

319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1971);

" . . . racial segregation, which is unconstitutional outside prisons, is unconstitutional within prisons, save for 'the necessities of prison security and discipline.' Lee v. Washington, 390 U.S. 333, 334, 88 S.Ct. 994, 19 L. Ed.2d 1212."

For other cases in which this principle has been applied to the administration of correctional institutions, *see, e. g.,* Owens v. Brierley, 452 F.2d 640 (3rd Cir. 1971); McClelland v. Sigler, 327 F. Supp. 829 (D.Neb.1971), aff'd., 456 F.2d 1266 (8th Cir. 1972); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd., 442 F.2d 304 (8th Cir. 1971); Wilson v. Kelley, 294 F.Supp. 1005 (N.D.Ga. 1968), aff'd., 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968); Tilden v. Pate, 390 F.2d 614 (7th Cir. 1968); Rivers v. Royster, 360 F.2d 592 (2d Cir. 1966); Rentfrow v. Carter, 296 F.Supp. 301 (N.D.Ga.1968).

■ Therefore, as part of the intermediate relief the district court's judgment enjoined the defendants from engaging in racial discriminatory practices of any nature in the operation or administration of the penitentiary. Recognizing that immediate desegregation in housing facilities could not feasibly be accomplished, the district court allowed the prison authorities until April 20, 1973, six months from the date of the judgment on October 20, 1972, to devise and implement a plan desegregating the housing facilities. Such relief was well considered, was within the jurisdiction of the district court and necessary for the prison operation to comport with the equal protection clause.

### B. *Physical Facilities and Medical Treatment*

The district court findings of fact, unchallenged here by appellants, described the living conditions at Parchman as follows.

The housing units are unfit for human habitation under any modern concepts of decency. Facilities for the disposal of human waste at all camps present an immediate health hazard; contamination of the prison water supply caused by inadequate sewage has led to the spread of infectious diseases. The entire waste disposal system has been condemned by state health and pollution agencies. The electric wiring is frayed and exposed, representing a safety hazard. At most camps there is a lack of adequate fire fighting equipment making it, as stated by the Penitentiary Superintendent, "almost impossible to put out a fire at Parchman with the present water system and the present fire-fighting equipment." The bathroom, kitchen, heating, and housing facilities are inadequate. Broken windows are stuffed with rags to keep out the cold and rain. The bathroom facilities lack the number and quality of operable commodes, showers and other hygienic necessities. For example, at Camp B., for 80 men, there are three wash basins which consist of oil drums cut in half. The building facilities at most camps, "are in a deplorable state of maintenance and repair," as reported by the Mississippi Joint Legislative Committee, January 4, 1971, and result in sub-human conditions.

The medical staff and available facilities fail to provide adequate medical care for the inmate population. As a result many inmates have not received prompt or efficient medical examination, treatment, or medication. Unsanitary conditions are rampant. Some inmates with serious contagious diseases are allowed to mingle with the general prison population; other inmates have developed complications from lack of medical treatment. Inmates are often discouraged from seeking medical attention by the prison practice of punishing those who on examination appear to be healthy.

■ The prohibition against cruel and unusual punishment contained in the Eighth Amendment, applicable to the State of Mississippi through the Due Process Clause of the Fourteenth

Amendment, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), is not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement that may prevail at a prison. Our decisions have recognized the right of prisoners to seek judicial review of their conditions of confinement and have provided relief from unconscionable methods of incarceration. *See, e. g.,* Hutchens v. State of Alabama, 466 F.2d 507 (5th Cir. 1972); Campbell v. Beto, 460 F.2d 765, 768 (5th Cir. 1972); Novak v. Beto, 453 F.2d 661 (5th Cir. 1971); Rocha v. Sowers, 454 F.2d 1155 (5th Cir. 1972); Woolsey v. Beto, 450 F.2d 321 (5th Cir. 1971); Sinclair v. Henderson, 435 F.2d 125 (5th Cir. 1970). Although the prison officials possess broad discretion in the area of conditions of confinement, this Court has repeatedly stated that there may be cases in which the deprivation of medical care or hygienic facilities will warrant judicial action. *See, e. g.,* Haskew v. Wainwright, 429 F.2d 525 (5th Cir. 1972); Roy v. Wainwright, 418 F.2d 231 (5th Cir. 1969); Granville v. Hunt, 411 F.2d 9 (5th Cir. 1969). Thompson v. Blackwell, 374 F.2d 945 (5th Cir. 1967); Schack v. Florida, 391 F.2d 593 (5th Cir. 1968); Bowman v. Hale, 464 F.2d 1032 (5th Cir. 1972). Burroughs v. Wainwright, 464 F.2d 1027 (5th Cir. 1972).

It is pertinent to review this Court's discussion in Novak v. Beto, 453 F.2d 661 (5th Cir. 1971), rehearing denied en banc, 456 F.2d 1303 (5th Cir. 1972), of the common thread in cruel and unusual punishment cases. In *Novak,* this Court held, one judge dissenting, that the lightless cell, the limited bedding and the minimal food provided prisoners in solitary confinement in Texas did *not* constitute cruel and unusual punishment. A noteworthy portion of the decision is the court's lengthy discussion emphasizing that the factual situation there did not involve a deprivation of basic elements of hygiene nor any threat to the prisoners' health:

"On the question of particular conditions, there are several cases that have concluded that certain prison conditions were so 'base, inhuman and barbaric' that they violate the Eighth Amendment. We have studied these cases and the conditions depicted herein rather carefully, and find in none of them support for condemnation of solitary confinement in this case. In the first place, *there is a common thread that runs through all these cases and that is not present in our case. That thread is the deprivation of basic elements of hygiene. See, e. g.,* Wright v. McMann, 2d Cir. 1967, 387 F.2d 519 [complaint alleged cell encrusted with excrement, plaintiff entirely naked, forced to sleep on concrete floor, windows open throughout sub-freezing weather, no soap, towel or toilet paper]; Hancock v. Avery, M.D.Tenn.1969, 301 F.Supp. 786 [hole for waste, flushed irregularly by guard, no soap, towel or toilet paper, prisoner slept naked on floor]; Holt v. Sarver, supra [isolation cells dirty and unsanitary, pervaded with bad odors, plain cotton mattress uncovered and dirty; conducive to spreading, and did spread, infectious diseases]; Jordan v. Fitzharris, N.D.Cal.1966, 257 F.Supp. 674 [cells not cleaned regularly, prisoner had no means to clean himself, a hole for receiving bodily wastes, no flushing mechanism]. By contrast with these cases, the prisoners in the TDC solitary confinement cells are deprived of none of the basic elements of hygiene." (Emphasis added) 453 F.2d at 665.

In addition, one segment of the *Novak* decision, labelled *"Exercise Caution So That Health Is Not Jeopardized,"* states: "We must also take into account the fact that the prison authorities as a matter of policy are careful to limit use of the diet to avoid damage to the prisoner's health." 453 F.2d at 670.

Moreover, this Court in Campbell v. Beto, 460 F.2d 765, 768 (5th Cir. 1972) has recently reaffirmed this discussion in *Novak* as follows:

" . . . it is apparent that the courts cannot close their judicial eyes to prison conditions which present a grave and immediate threat to health or physical well being. Haines v. Kerner, *supra,* [1972, 404 U.S. 519, 92 S. Ct. 594, 30 L.Ed.2d 652]; Woolsey v. Beto, 5 Cir. 1971, 450 F.2d 321; Rocha v. Sowers, 5 Cir. 1972, 454 F.2d 1155; Jackson v. Bishop, 8 Cir., 1968, 404 F.2d 571; Novak v. Beto, 5 Cir., 1971, 453 F.2d 661, 665, rehearing en banc denied, 1972, 456 F.2d 1303. If the 'deprivation of basic elements of hygiene' has consistently been held violative of constitutional guarantees (see *Novak, supra,* 453 F.2d at 665), then *certainly* practices which result in the deprivation of basic elements of adequate medical treatment, particularly such deprivation as immediately threatens life and limb, would be equally vulnerable." (Emphasis supplied).

Thus the adequacy of conditions of confinement of prisons—such as medical treatment, hygienic materials, and physical facilities—is clearly subject to Eighth Amendment scrutiny.

In contrast to the factual situation in *Novak,* this case involves conditions and practices that clearly threaten the health and well being of the prison community and substantially deprive inmates of basic elements of hygiene and adequate medical treatment. The district court found that the plaintiffs in this case had shown by substantial evidence that the prison authorities had clearly abused their discretion in providing physical facilities and medical treatment to inmates.

In addition, these conditions deny inmates proper care, treatment, and feeding as required by State law, Miss.Code Ann. § 7930, wholesome food prepared under sanitary conditions as required in Miss.Code Ann. § 7942, and efficient hospital and medical services as provided in Miss.Code Ann. § 7959.[3] Although constitutional questions do not arise merely because a state prisoner has been treated at variance with state law, it is still significant that the current conditions at Parchman even fail to comply with the state standards, much less constitutional norms.[4]

3. Section 7930 states: "The superintendent, . . . shall be vested with the exclusive management and control of the prison system, and all properties belonging thereto, subject only to the limitations of this act and shall be responsible for the management of affairs of the prison system and for the proper care, treatment, feeding, clothing and management of the prisoners confined therein . . ."

Section 7942 states: "The superintendent shall see that all state prisoners are fed good and wholesome food, properly prepared under wholesome, sanitary conditions, and in sufficient quantity, and reasonably varied, and he shall hold employees performing this work strictly to account for any failure to carry out this provision. . . ."

Section 7959: "The prison hospital at Sunflower farm shall be under the immediate control and management of the prison physician, but under the general control of the superintendent. . . . There shall be separate wards for male and female prisoners and other classifications as the superintendent may provide and it shall be equipped for the treatment of sick and wounded prisoners . . . He shall cause all prisoners to be vaccinated for all communicable diseases known to constitute a health hazard under such living conditions. . . . The Board of Trustees of State Eleemosynary Institutions shall make periodic inspections of the hospital facilities at the Mississippi State Penitentiary to see that hospital procedures, health standards, and sanitary conditions are maintained in a satisfactory manner, and make recommendations and suggestions pertaining to same to the Superintendent of the Mississippi State Penitentiary, and the Governor of Mississippi."

4. At different points we will discuss the deviation of the Parchman practices from Mississippi law. Because of the federal claims, this Court has jurisdiction of this case. 28 U.S.C. §§ 1331(a) and 1343(3) and (4). Our pendent jurisdiction is not limited to federal questions, but extends to questions of state law that arise out of the same operative facts.

■ Therefore, we agree with the district court's conclusion that the prison authorities have abused their discretion and that the confinement of inmates at Parchman, in barracks unfit for human habitation and in conditions that threaten their physical health and safety and deprive them of basic hygiene and medical treatment by reason of gross deficiencies in plant, equipment and medical staff, not only departs from state law, but constitutes cruel and unusual punishment.

■ To reiterate, the defendants admitted the unconstitutionality of these conditions, the district court so found, and our review of the law compels us to agree. The challenged issue is whether the district court's judgment here ordered relief beyond what was minimally required to comport with the Constitution's prohibition against cruel and unusual punishment.

As *immediate* relief regarding medical care, the district court required the defendant prison authorities (1) to employ such additional medical personnel as necessary so that the prison's medical staff shall consist of at least three full-time physicians, two full-time dentists, two full-time trained physician assistants, six full-time nurses certified as RN or LPN, one medical records librarian, and two medical clerical personnel, and to obtain the consultant services of a radiologist and a pharmacist; (2) to comply with the general standards of the American Correctional Association relating to medical services for prisoners; (3) to have the prison hospital and equipment brought into compliance with state licensing requirements for a hospital and infirmary, including adequate treatment for the chronically ill; (4) to refrain from punishment unless the superintendent makes an express finding that the inmate seeks medical care unnecessarily and for malingering purposes; and (5) to refrain from the use of inmates to fill any of the above described civilian medical staff, but to encourage utilization of trained and competent inmate personnel to supplement the above minimal civilian medical staff.

As *immediate* relief concerning the physical facilities, the court ordered the defendant prison officials to make all improvements and expenditures which were specified in the Interim Committee's Report on Mississippi State Penitentiary (subject to recommendations of State pollution authority.) These improvements, which include the installation of facilities, renovation of living quarters, employment of additional personnel, and purchase of other equipment and supplies, were ordered to be completed by December 20, 1972. In addition, the court instructed the defendants to file by December 20, 1971 a report with the court which details all facilities and equipment purchased, installed, and/or improved, the location of such installation or improvement, and the date of the installation or improvement.

As *long range* relief, the district court instructed the prison officials to submit by December 20, 1972, a comprehensive plan for the elimination of all unconstitutional conditions in inmate housing, inadequate inmate housing, inadequate water, sewer and utilities, inadequate fire fighting equipment, inadequate hospital and other structures. The court then suggested areas of study that should be included in this plan, "without undertaking to dictate or limit the nature or content of long-range plans."

The court's order regarding immediate relief reflects a tenor of restraint and use of independent sources' studies, in determining to what extent the conditions at Parchman must be changed in order to meet minimal constitutional standards. The appellants' brief does not challenge specific elements in the order, but generally complains of insufficient funds to implement these ingredients.

The district court found that the record showed that the medical facilities were grossly understaffed and the physical facilities totally inadequate. The more difficult task is discerning the ex-

act remedy to eleviate these conditions to minimal constitutional standards. At this juncture, approximately two years after the entry of the district court's initial judgment, we are concerned over unnecessarily and uninformedly adjudicating this complex question. In view of the recognition by the prison officials themselves of the unconstitutionality of the practices and the extensive studies, compiled by the Mississippi Legislature and other professional consultants, recommending renovations in these two areas, we must assume at least initial improvements have been accomplished. Furthermore, the district court ordered the defendants to submit a long range plan for improving medical and physical facilities. This court does not know the content of this plan, and to what extent, if any, the prison officials have already remedied the conditions at Parchman.

In short, we clearly have affirmed that part of the district court order recognizing the unconstitutionality of the conditions generated by the inadequate medical care and insufficient physical facilities. In addition, we recognize the district court's power to prescribe a remedy. However, any decision dissecting what precise degree of improvements in these two areas is necessary to meet constitutionally minimal standards is premature at this stage. We uphold the present injunctive relief for the time being, but recognize that the district court has retained jurisdiction to update the present conditions at Parchman. Given the avowed interest of various entities, including the Mississippi Legislature, the LEAA and other consultant professionals in this project, it is anticipated that cooperation will prevail and will result in implementing the necessary constitutional innovations.

### C. *Solitary Confinement:*

The penitentiary superintendent's statutory authority to prescribe rules regarding solitary confinement of prisoners is limited by Miss.Code Ann. § 7968 in the following manner:

"The superintendent may set up rules regarding the discipline of prisoners. No prisoner may be placed in solitary confinement except under orders of the superintendent. Any prisoner held in solitary confinement shall be fed at least once every day and shall be examined by a physician at least once every two (2) days. No prisoner shall be placed in the 'dark hole' of the maximum security unit for a longer period than twenty-four (24) hours. . . . "

Although solitary confinement, as a mode of punishment, is not per se cruel and unusual, there are constitutional boundaries to its use. There is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment.

Once again, a prerequisite in resolving whether the solitary confinement *as practiced at Parchman,* constitutes cruel and unusual punishment, is to examine the solitary confinement conditions in *Novak, supra,* which this Court held *not* violative of the Eighth Amendment. Solitary confinement in *Novak,* was described as follows:

"It is uncontradicted that solitary cells are scrubbed by the guards each time the prisoner leaves to bathe, which occurs at least three times a week. The cells are identical to the regular cells of the TDC in size and facilities; they contain flush toilets, a drinking fountain, and a bunk. The prisoner is supplied with toilet paper, a toothbrush and toothpaste. Although the bunk is stripped in the sense that it has no mattress or pillow, the prisoner is given two blankets and is clothed in a gown or other garb, so that there is nothing to compare with the reports of prisoners sleeping naked on concrete floors in the above-cited cases. In addition, solitary cells in the TDC have the same temperature controls that regular cells in the prison have." 453 F.2d at 665.

These conditions of solitary confinement in *Novak* are completely dissimilar to those in the case at bar. At Parchman, each wing of the Maximum Security Unit (MSU) contains thirteen cells, each of which is approximately 8′ x 10′ in size. The individual cells are equipped for use by two men, with double metal bunks, lavatory and commode. In addition, each side has one 6′ x 6′ cell, known as the dark hole, with no lights, commode, sink or other furnishings. A hole in the concrete floor is located in the middle of the cell and is approximately 6″ in diameter that will flush to dispose of body wastes. A heavy metal door without a window closes the cell. For solitary confinement at Parchman the inmates are placed in the dark hole, naked, without any hygienic material, without any bedding, and often without adequate food. It is customary to cut the hair of an inmate confined in the dark hold by means of heavy-duty clippers. Inmates have frequently remained in the dark hold for forty-eight hours and may be confined there for up to seventy-two hours. While an inmate occupies the dark hole, the cell is not cleaned, nor is the inmate permitted to wash himself.

■ Even under the restrictive standards for determining cruel and unusual punishment enunciated in *Novak*, this solitary confinement in the dark hole at Parchman undoubtedly meets the test as found by the district court. It is unassailable that the solitary confinement of naked persons in MSU's dark hole, without any hygienic materials, *any* bedding, adequate food or heat, without opportunity for cleaning either themselves or the cell, and for longer than twenty-four hours continuously, is constitutionally forbidden under the Eighth Amendment.

■ The district court refused to enjoin use of the dark hole under all circumstances, but permitted its use only under the following conditions: (1) inmates be fed the daily prison ration, or at least 2000 calories per day; (2) inmates be permitted to wear regular institutional clothing; (3) inmates be supplied with soap, towels, toothbrush and shaving utensils; (4) all cells be adequately heated, ventilated and maintained in a sanitary condition; (5) no inmate shall be confined in any isolation cell, referred to as the dark hole, for a period in excess of twenty-four hours. The time limitation and food provision were already required by the state law, Miss.Code Ann. § 7968. The clothing, heating, sanitation stipulations merely conform to the conditions of solitary confinement existing in *Novak*. It is clear that these changes ordered by the district court only alleviate the conditions of solitary confinement to minimal constitutional standards and do not exceed the court's remedial jurisdiction.

### D. *Corporal Punishment:*

In addition to prescribing the length of solitary confinement, Miss.Code Ann. § 7968 also expressly discourages corporal punishment of any kind, and forbids it except upon express written order of the superintendent.[5]

---

5. Section 7968 states: "The superintendent may set up rules regarding the discipline of prisoners . . . . Corporal punishment of any kind is. hereby discouraged and shall not be administered to any prisoner except on the written authority of the superintendent and if corporal punishment is administered, to any prisoner, it shall be administered in the presence of any two (2) of the following persons; the superintendent, the chaplain or a member of the board. Whenever a sergeant or other employee of the penitentiary considers it necessary that a prisoner be punished, he must make a written report to the superintendent regarding punishment, stating in such report the offense committed by the prisoner and in the event the superintendent, after investigation, considers it necessary that such prisoner be given corporal punishment, he shall give written authority therefor directed to the sergeant specifying the number of licks or lashes, not to exceed seven (7) which may be administered. The written request of the sergeant and the written authorization of the superintendent, signed by them, as well as a statement by the witnesses attesting that they witnessed the lashing, shall be placed in the file of the prisoner

■ Section 7968 makes it illegal for any prison official other than the superintendent to order corporal punishment; and where corporal punishment is expressly authorized by the superintendent, it is limited to the whip or lash, which is not to be used for more than seven licks. While the evidence indicated that the lash had not been used at Parchman since 1965, the record was replete with innumerable instances of physical brutality and abuse in disciplining inmates who are sent to MSU. These include administering milk of magnesia as a form of punishment, stripping inmates of their clothes, turning the fan on inmates while naked and wet, depriving inmates of mattresses, hygienic materials, and adequate food, handcuffing inmates to the fence and to cells for long periods of time, shooting at and around inmates to keep them standing or moving, and forcing inmates to stand, sit or lie on crates, stumps, or otherwise maintain awkward positions for prolonged periods. Indeed, the district court found the superintendent and other prison officials acquiesced in these practices. Unquestionably, the district court correctly enjoined prison authorities from punishing inmates by these methods of corporal punishment. We have no difficulty in reaching the conclusion that these forms of corporal punishment run afoul of the Eighth Amendment, offend contemporary concepts of decency, human dignity, and

precepts of civilization which we profess to possess. *See, e. g.,* Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968) (J. Blackmun) (use of strap for whipping).

### E. *Trusty System:*

A system of inmate trusties is authorized by Miss.Code Ann. § 7965 until July 1, 1974:

"From and after July 1, 1974, no inmate at the penitentiary shall serve as a trusty and perform any duties of guarding other inmates to prevent their escape. Prior to the date aforesaid, the superintendent may select *a reasonable number of deserving and trustworthy inmates* to be used to guard inmates and to supervise their prison work details. The superintendent shall, within the monies appropriated by the Legislature, employ a reasonable number of civilian guards to prevent inmates from escaping and in supervising inmates' work details. The Board is authorized to eliminate the trusty system at a faster and earlier date if deemed feasible and consistent with consolidation procedures and operations as outlined in Section 11 [§ 7926.5] of this act." (Emphasis supplied).

The inefficacy of the Parchman trusty system stemmed from the prison authorities' failure to select as trusties "deserving and trustworthy inmates" as required by state law.[6]

---

involved and a copy of same shall be placed in permanent register available to the Governor, the board and legislative investigating committees. . . ."

6. The Mississippi State Penitentiary Rules and Regulations Handbook, issued February, 1973, also stressed that the trusties should be deserving and trustworthy inmates:

"TRUSTY SYSTEM"
"At the Mississippi State Penitentiary there are two categories of trustys. They are Full-Trusty and Half Trusty.

"FULL TRUSTY. This category is provided for inmates who are considered to be trustworthy in every respect, and who have by virtue of their work habits, conduct, and attitudes of cooperation proven their trustworthiness. Full Trustys are in

the Minimum 'B' Custody classification, and can work without constant supervision by employees or security officers.

"HALF TRUSTY. This category is provided for inmates who are considered to be trustworthy, but need limited supervision by employees or security officers. Such inmates have proven their reliability through their work habits, conduct and attitudes. Half Trustys are in the Minimum 'A' Custody classification and require only limited supervision by employees or security personnel.

"In order to become a Full Trusty or a Half Trusty, the inmate must be recommended to the Classification Committee for a change in custody classification by his Camp Sergeant or a member of the administrative staff of the institution.

The district court found that the trusties at Parchman were selected by the sergeants without the use of objective criteria or uniform standards and in a process infected with payoffs, favoritism and extortion. The responsibility of guarding other inmates was primarily performed by these trusties. Some of the trusties were armed, referred to as "trusty shooters" and numbering approximately 150. Armed trusties guarded each of the prison camps, oversaw inmates while working in the fields, and on occasions were left in sole charge of the fields. Penitentiary records indicated that some of the armed trusties had been convicted of violent crimes, and, that of the armed trusties serving as of April 1, 1971, thirty-five percent had not been psychologically tested, forty percent of those tested were found to be retarded, and seventy-one percent of those tested were found to have personality disorders. There was no formal program for training trusties. Trusties were instructed to maintain discipline by shooting at inmates who got out of gun line; in many cases trusties had received little training in the handling of firearms. In addition to abusing their authority and engaging in loansharking, extortion and other illegal conduct, the trusties shot, maimed or otherwise physically maltreated scores of inmates subject to their control. For example, during Superintendent Cook's administration, thirty inmates received gunshot wounds, an additional twenty-nine inmates were shot at, and fifty-two inmates were physically beaten.

On October 20, 1972, the district court ordered the prison officials (1) to eliminate all trusties at MSU and replace them with civilian guards; and (2) to replace all armed shooters in the fields with civilian guards by December 20, 1972. On that date the prison authorities were to submit a plan for the total elimination of the use of trusties for armed guard duty and for other custodial responsibility no later than June 20, 1973. In the interim period, i. e. from October 20, 1972 to June 20, 1973, custodial trusties could be used if selected after a careful review of inmate personnel records and psychological tests assuring that the inmates were mentally and emotionally fit to perform their assigned tasks.

In section 7965 the Mississippi Legislature has called for the complete elimination of this trusty system by July 1, 1974. That statute encourages this eradication at a "faster and earlier date if deemed feasible." Furthermore, the Parchman trusty system has been the subject of investigation and critical comment in past years by committees of the Mississippi Legislature, by public officials and by a study team from the University of Georgia. Comprehensive reports of such findings were last submit-

"The Classification Committee has established the following policy to regulate applications for change of custody classification considered for a change of custody classification.

"1. Inmates having detainers against them will not be considered for a change of custody classification.

"2. Inmates who have been convicted of a charge of arson or for any sexual offense will not be considered for a change of custody classification until they have been examined and approved by the Psychiatric Staff of the State Hospital at Whitfield or the Staff Psychiatrist of the State Penitentiary.

"3. Inmates who have escaped from a penal institution within four years of the date of application will not be considered for a change of custody classification.

"4. Inmates who have escaped from jails or mental institutions or similar institutions of confinement within two years of application will not be considered for a change of custody classification.

"5. Inmates having served less than ninety days in the institution will not be considered for a change of custody classification.

"6. Inmates who are in the Half-Trusty classification must remain in that classification at least ninety days before they can be considered for the Full-Trusty classification.

"7. Inmates who have lost their Trusty classification due to disciplinary action will not be considered for reinstatement prior to ninety days from the completion of the punishment for the offense."

ted to the Mississippi Legislature in 1971. As a result, section 7965 calling for the removal of the trusty system was approved April 29, 1971. More recently, a consultant committee engaged by the Mississippi State Planning Agency, the LEAA, and the American Correctional Association reviewed conditions at Parchman and found that the prison was operated in accordance with the following three principles which must be eliminated to correct gross deficiencies in the prison administration, to wit: (1) The prison system must operate at a profit at any cost; (2) Armed inmate guards are acceptable and capable of insuring safety and security within the system; and (3) Security and control of inmates are insured through maintaining a high degree of fear within the inmate population.

■ One basis for the district court's order was that the trusty system, as presently constituted and practiced, was a method of cruel and unusual punishment. After placing in the hands of some inmates weapons or other forms of control over the other inmate population, the prison officials either could not or had failed to prevent the arbitrary infliction by the trusties of physical and *economic injury* upon their fellow inmates. A second underpinning of the district court order was deviation from state law: "Indeed, the Mississippi statutes do not contemplate for guard duty the use of trusties who are corrupt, venal, incompetent, or dangerous." Moreover, the Mississippi Legislature had even called for its elimination. We have no difficulty in reaching the conclusion that this trusty system, which utilizes unscreened inmates violates state law, and which allows inmates to exercise unchecked authority over other inmates, constitutes cruel and unusual punishment in violation of the Eighth Amendment, warranting the district court's prohibition of certain portions of the trusty system prior to the legislative cut off date of July 1, 1974. We do not dis-

cuss at length the intricacies of the procedure for eliminating the trusty system as proposed by the district court's order, for due to the lateness of the hour even the cut off date proscribed by Mississippi's Legislature has passed. The district court's abolition of the trusty system can easily be justified at *this* juncture as simply in conformance with the state law.[7]

### F. *Inadequate Protection of Inmates*:

Inmates, except those who are in MSU, are housed in buildings which have two separate wings and contain barracks known as "cages"; one for regular inmates called "gunmen" and the other for trusties. On the gunmen side the inmates are placed in one large room where they are assigned to bunks. The district court found that the risk of personal injury inherent in this cage confinement was increased by the following practices. The inmates are not classified according to the severity of their offense, resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes. In addition, the custodial responsibility of inmates has been assigned to other inmates who serve as hallboys, floorwalkers and cage bosses. Hallboys perform administrative duties; floorwalkers are non-trusties who perform custodial duties and on whose recommendation inmates may be punished. Cage bosses are charged with enforcing discipline in the barracks. The evidence is replete with instances of inhumanities, illegal conduct and other indignities visited by these inmates who exercise authority over their fellow prisoners.

Although many inmates possess weapons, there is no established procedure for discovering and confiscating weapons, nor is possession of weapons reported or punished. The record revealed at least eighty-five instances where inmates had physically assaulted other inmates; twenty-seven of these assaults

7. *See* footnote p. 1302, *supra.*

involved armed attacks in which an inmate was either stabbed, cut or shot.

Only *one* civilian guard is assigned to each camp. The one civilian guard is prohibited from entering the cages. As stated by Superintendent Cook, penitentiary employees have no control over inmates after the lights are turned out and "there is no way that anyone can guard the safety of an inmate in the Parchman situation," because of the dormitory style system and the lack of civilian guards. The district court found that in some cases, supervisory personnel have allowed inmates to fight, gamble and acquire liquor and drugs in violation of prison rules and state law. The operation of the trusty system, as previously outlined, further compounds the dilemma of the protection of inmates.

The district court determined that the Parchman administration had subjected its inmate population to cruel and unusual punishment by failing to provide adequate protection against physical assaults and abuses by other inmates, by placing excessive numbers of inmates in barracks without adequate classification or supervision, and by assigning custodial responsibility to incompetent and untrained inmates. While prison officials may take all reasonable steps to insure proper prison discipline, security and order without threatened intervention by a federal court, the actions and practices here go far beyond any concept of reasonableness. It is the obligation of penitentiary officials to insure that inmates are not subjected to any punishment beyond that which is necessary for the orderly administration of Parchman. Although the limits of the Eighth Amendment's proscription are not easily or exactly defined, certainly one facet of cruel and unusual punishment would be caging inmates in one barrack room and giving incompetent inmates weapons, the authorization to use them and the power to recommend disciplinary action, unsupervised by any prison authorities, which results in assaults on other inmates. The infliction of these physical injuries is no less tolerable because accomplished by the inmates with the assistance and acquiescence of the prison authorities, then if perpetrated by the prison superintendent alone. Each factor separately, i. e., overcrowding dormitory barracks, lack of classification according to severity of offense, untrained inmates with weapons, lack of supervision by civilian guards, absence of a procedure for confiscation of weapons, may not rise to constitutional dimensions; however, the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment, as determined by the trial court.

Therefore, the district court ordered the prison authorities to implement (1) a system of assigning inmates to barracks according to the severity of their offense, (2) a system of reporting inmate assaults to the County Prosecuting Officer, maintaining a record of assaults on other inmates, and making reasonable efforts to isolate inmates who have a history of violence on other inmates, (3) a procedure for controlling the possession of weapons by inmates, (4) a rule prohibiting gambling and fighting, (5) a plan requiring three civilian guards to be assigned to each barracks during night hours and the inmate cage bosses, hallboys, and floorwalkers to be relieved of all custodial responsibilities, and (6) the temporary measure of placing wire or other dividers in appropriate places to ameliorate the risk of personal injury by overcrowding of inmates in a single room. These were regarded as interim measures to be carried out by December 20, 1972, within two months of the judgment. The modification of the physical facilities generally and the eradication of the entire trusty system, two elements of relief in other areas, were conceived to provide the necessary greater long term improvements in inmate protection.

 Not only do we agree that the totality of the present practices fosters cruel and unusual punishment, but we also conclude that none of the above

measures ordered require burdensome implementation or is beyond the remedial jurisdiction of the district court. Rather they merely construct the minimal foundation for assuring that the confinement in the present dormitory style facilities at Parchman does not run afoul of the Eighth Amendment. Constantly mindful that the federal courts should not undertake to run the prison and completely aware as we are that this part of the judgment does set forth tasks involved in the administration of a penal institution, we nonetheless determine that the remedy ordered simply sets forth the parameters for administration and leaves for the prison officials wide latitude in which to devise the manner in which these concepts may be implemented.

### G. *Mail Censorship*:

Prior to trial, the practice at Parchman was to censor *all incoming and outgoing* mail of inmates. On May 5, 1972, Superintendent Collier issued a memorandum on correspondence advising that there would be *no censorship of incoming or outgoing mail,* that there would be no limit to letters an inmate may write except where limitation may be imposed as a matter of discipline, and that only *incoming mail* would be *opened in the presence of the inmate* to determine whether money is contained therein. The October 20, 1972 judgment of the district court ordered the following regarding correspondence:

"(1) Said defendants, and all persons in privity with them, *shall not open* or otherwise interfere with any *outgoing* mail of inmates addressed to:

(a) Officials of the federal, state and local courts;

(b) All federal officials including the President of the United States, any senator or congressman, and officials of any United States agency or department; all state officials including the Governor, members of the state Senate and House of Representatives and officials of any state agency or department;

(c) All members and employees of the State Probation and Parole Board;

(d) The attorney of record of an inmate in any pending action, civil or criminal, in any duly constituted local, state or federal court.

(2) Said defendants, and all persons in privity with them, are prohibited from interfering with *outgoing* mail of inmates to any other addressee *except to open and inspect, in the presence of the inmate, any letter where prison officials have reasonable ground to suspect such communication is an attempt to formulate, devise or otherwise effectuate a plan to escape from the penitentiary, or to violate the laws of the State of Mississippi or of the United States.*

(3) The defendants, and all persons in privity with them, are prohibited from interfering with *incoming* mail from any source *except to open and inspect such mail, in the presence of the inmate addressee, whenever the prison officials have reasonable grounds to suspect escape attempts or to discover drugs, weapons or other material expressly prohibited by state or federal law or by prison rules.*

(4) There shall be no restriction placed on the number of letters that an inmate may write to the addressees listed in (1) above. Reasonable limitations may be imposed upon all other classes of mail as an appropriate disciplinary measure pursuant to published prison rules." (Emphasis supplied).

In the February, 1973 handbook, the Mississippi Penitentiary Board promulgated new regulations regarding correspondence which fully incorporated each requirement of the district court's

prescription.[8] Although the appellants challenge the district court's order in its entirety on appeal, the mail issue was not focused upon as beyond the remedial jurisdiction of the district court.

Moreover, two recent Supreme Court cases have made it clear that revision in Parchman's mail rules was constitutionally compelled. In Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L. Ed.2d 224 (1974), the Supreme Court held that First Amendment liberties of the correspondents with inmates were implicated in censorship of inmate mail. Noting that the federal courts have traditionally adopted a broad hands-off attitude toward problems of prison administration, the Supreme Court, nonetheless, determined that prison officials did not have unbridled discretion in establishing inmate mail regulations. The majority opinion emphasized that it was not adjudicating to what extent an inmate's right to free speech survives incarceration, but grounded its holding on the narrower basis that the inmate correspondent's rights were being violated by the censorship. The Court stressed that whatever the status of an inmate's claim to uncensored mail, the censorship of prisoner mail concomitantly imposes a restriction on the First and Fourteenth Amendment rights of those who are not prisoners, and therefore may be curbed. The Court then formulated the proper standard for deciding whether a particular regulation or practice relating to inmate correspondence constitutes an impermissible restraint of the First Amendment liberties of the inmate's correspondent. The Court held that the censorship of inmate mail was justified (1) if the regulation or practice in question furthered an important or substantial governmental interest unrelated to the suppression of expression and (2) if the limitation of First Amendment freedoms was no greater than is necessary or essential to the protection of the particular governmental interest involved. Utilizing that standard, the Supreme Court upheld the district court's invalidation of regulations that authorized, *inter alia*, censorship of statements that

---

8. The regulations in the 1973 handbook entitled "Mississippi State Penitentiary: Rules and Regulations," state:

"POLICY REGARDING MAIL. It is considered essential to the eventual resocialization of the inmates that they maintain contact with their families and desirable friends through use of the mail. Therefore, inmates are encouraged to make use of the mail and every means compatible with security is provided for them to do so.

S401. OUTGOING MAIL. Outgoing mail of inmates addressed to the following will not be opened or otherwise interfered with:

1. Officials of the federal, state and local courts.

2. All federal officials, including the President of the United States, any senator or congressman, and officials of any United States agency or department; all state officials, including the Governor, members of the state Senate and House of Representatives; and officials of any state agency or department.

3. All members and employees of the State Probation and Parole Board.

4. The attorney of record of an inmate in any pending action, civil or criminal, in any duly constituted local, state or federal court. Other outgoing mail of inmates to any other addressee will not be interfered with except to open and inspect, in the presence of the inmate where prison officials have reasonable grounds to suspect such communication is an attempt to formulate, devise, or otherwise effectuate a plan to escape from the penitentiary, or to violate the laws of the State of Mississippi or of the United States.

S402. INCOMING MAIL. Incoming mail from any source will not be interfered with except to open and inspect such mail, in the presence of the inmate addressee, whenever the · prison officials have reasonable grounds to suspect escape attempts or to discover drugs, weapons or other material expressly prohibited by state or federal laws or by prison rules. Inmates shall be given written notice which describes any material confiscated or returned and the reason for such action. Any material confiscated because of alleged obscene content shall be recorded and forwarded to federal postal authorities for appropriate action.

S403. MAIL LIMITATIONS. There shall be no restriction placed on the number of letters or addresses to whom an inmate may write."

"unduly complain" or "magnify grievances," expressions of "inflammatory political, racial, or religious or other views," and matter deemed "defamatory" or "otherwise inappropriate." [9]

In addition, the *Procunier* Court agreed with the district court that the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards. The Court approved the district court's requirement that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence.

Soon thereafter, the Supreme Court again considered inmate correspondence in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), where the narrow issue presented was whether *incoming* letters from attorneys could be *opened* by prison authorities in the presence of the inmate or whether such mail must be delivered unopened if

normal detection techniques failed to indicate contraband. The prison regulation under challenge in that case provided that "all incoming and outgoing mail will be read and inspected." The state conceded that it could not open and *read* incoming mail from attorneys, but contended, that it could *open* all *incoming* letters from attorneys *in the presence of the inmates*.[10] Ultimately, the *Wolff* Court did not adjudicate the constitutional requirements pertinent to the opening of inmate-attorney mail, for the Court concluded that

> "the State [in that case], by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, has done all, and perhaps even more, than the Constitution requires." 418 U.S. 539, 577, 94 S.Ct. 2963, 2985, 41 L.Ed.2d 935.

Therefore, the issue whether the inspection of incoming mail from attorney must be accompanied by the presence of the inmate in order to satisfy constitutional standards was not actually resolved.

9. The Court stated:
"These regulations fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship. Not surprisingly, some prison officials used the extraordinary latitude for discretion authorized by the regulations. to suppress unwelcome criticism. For example, at one institution under the Department's jurisdiction, the checklist used by the mailroom staff authorized rejection of letters 'criticizing policy, rules or officials,' and the mailroom sergeant stated in a deposition that he would reject as 'defamatory' letters 'belittling staff or our judicial system or anything connected with the Department of Corrections.' Correspondence was also censored for 'disrespectful comments,' 'derogatory remarks,' and the like.
"Appellants have failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression. Indeed, the heart of appellants' position is not that the regulations are justified by a legitimate governmental interest but that they do not need to be. . . . The reg-

ulation, however, is not narrowly drawn to reach only material that might be thought to encourage violence nor is its application limited to incoming letters. In short, the Department's regulations authorized censorship of prisoner mail far broader than any legitimate interest of penal administration demands and were properly found invalid by the District Court." 416 U.S. at 415, 94 S.Ct. at 1812 (1974).

10. The Supreme Court reemphasized that Procunier v. Martinez, *supra*, was not based on the inmates' rights but on the correspondent's rights: "While First Amendment rights of correspondence with prisoners may protect against the censoring of inmate mail, when not necessary to protect legitimate governmental interests, see Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L. Ed.2d 224 (1974), this Court has not yet recognized First Amendment rights of prisoners in this context, see Cruz v. Beto, *supra*, Cooper v. Pate, *supra* [378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964)]. Furthermore, freedom from censorship is not equivalent to freedom from inspection or perusal." 418 U.S. 539, 575, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974).

Turning to the instant case, first, we readily conclude under the standard of review announced in *Procunier*, that the previous Parchman practices of censoring *all incoming and outgoing* mail are unconstitutional. Although the Supreme Court in *Procunier* settled one facet of inmate-mail litigation by determining that the prison officials in the name of internal administration could not at will *censor* inmates' mail due to the infringement *on the rights of the correspondent* with the inmate, significant collateral problems regarding the extent to which mail could be *opened, although unread,* were left unanswered. For example, two principal questions remaining would be (1) whether disallowing *any* opening of *outgoing* mail to a designated class of public officials is constitutionally compelled, and (2) whether *opening* all *incoming* mail and *opening* all *outgoing* mail except to the designated class of public officials, could only be accomplished in the presence of the inmate, in order to meet constitutional standards. Moreover, given *Procunier's* broad indictment of inmate mail censorship except in narrow circumstances, it would be feasible to raise the issue in subsequent mail cases, to what extent would disallowing reading, but allowing opening without the presence of the inmate when normal detection devises have failed to discover contraband, permit a subterfuge of the censorship prohibition.[11] Another question might be whether the governmental interest in maintaining security is legitimately furthered under the *Procunier* standards by opening *outgoing* mail to persons in the public trust, such as those in the designated class of public officials in the district court's order.

It should be noted that the district court's order here incorporated with foresight the dilemma in *Wolff*, by allowing officials to open and inspect all *incoming* mail in the presence of the inmate. Furthermore, prior to the Supreme Court's recent mail decisions, this Court had surmised that the censorship of inmate-attorney mail may constitute a denial of federal constitutional rights. Barlow v. Amiss, 477 F.2d 896, 898 (5th Cir. 1973); Frye v. Henderson, 474 F. 2d 1263 (5th Cir. 1973); cf. Cruz v. Hauck, 475 F.2d 475 (5th Cir. 1973). Also, this Court had previously held that *opening* of an inmate's *incoming* mail from his attorney, the courts and public officials by an electric letter opener to determine whether contraband was being sent into the prison did not deny any federally protected right. Frye v. Henderson, 474 F.2d 1263 (5th Cir. 1973). The district court here incorporated that holding with the caveat discussed in *Wolff*, that the inspection occur in the presence of the inmate.[12]

---

11. The rationale for allowing the presence of the inmate was well stated by the First Circuit Court of Appeals in Smith v. Robbins, 454 F.2d 696, 697 (1st Cir. 1972), where the court required the presence of an inmate for the inspection of inmate-attorney mail:

"However strongly the warden may feel about a possible indignity to the prison administration in a suggestion by the court that it is not to be trusted not to read the letter, this misses the point. The court does not suggest that the warden is untrustworthy. Rather, it is that a prisoner, and possibly some attorneys, may feel, if only to a small degree, that someone in the chain of command may not be trusted, and that the resulting fear may chill communications between the prisoner and his counsel. Once it is granted, as the warden now concedes, that the prisoner has a right to have the confidence between himself and his counsel totally respected, the burden must be on the warden to show a need for any act which could produce even a suspicion of intrusion. If a prisoner can see no good reason for opening a letter in his absence, it would not be unnatural for him to suspect a bad one. Inasmuch as the warden has failed to suggest any reason that seems adequate even to us, we see no reason to leave such possible apprehensions on such an important matter as right to counsel in the minds of the prisoner or his attorney."

12. We point out that certain issues previously adjudicated by this Court concerning correspondence are not presented here and thus do not require in this case reconsideration in light of the recent *Procunier* and *Wolff* deci-

In any event, inasmuch as the state in the case at bar has promulgated regulations which incorporate all elements of the district court's order and since the parties have not specifically challenged in their brief the components of that order, it would be inappropriate in this case to delimit the boundaries of the First Amendment mail protection of the inmates' *correspondents* and to define to what extent an *inmate's* First Amendment rights survive incarceration. Therefore, we do not adjudicate whether the requirements that the inspection be in the presence of the inmates, as well as the other components of the district court's order are constitutionally compelled, since the state at this juncture has acceded to adopting these regulations, and has not specifically challenged the extent of the district court's order on this facet of the appeal.[13]

## H. *Disciplinary Procedures:*

Prior to November, 1970, inmates were punished summarily without adherence to any defined procedure. Thereafter, the superintendent established a "trial council," composed of three civilian penitentiary employees, to handle disciplinary actions against inmates. The camp sergeant was charged with preparing a written report of the violation and with delivering it to the security officer for distribution to the trial council. The council was required to interview an inmate and adjudicate his guilt. The record revealed that an inmate was not notified of the charge orally or in writing prior to appearance

before the council, the inmate was not permitted assistance, was not allowed to present witnesses, or cross-examine and was not entitled to a transcript of the proceedings. The sergeant's written report to the council need not identify anyone with personal knowledge of the information or investigation by the sergeant. Only in one percent of the cases, did the trial council make any independent investigation, and the word of the reporting sergeant was generally accepted if it contradicted the inmate's report. The punishment recommendation of the reporting sergeant was generally approved by both the trial council and the superintendent. Punishments imposed were not uniform. Finally, although the rules required all offenses to be heard by the trial council, the district court found that inmates had been punished without a hearing, not only for conduct which was not listed in the charges, but for conduct which was not a violation of prison rules.

To rectify these practices, the district court's October 20, 1972 order required the immediate implementation of the following practices:

"(a) An inmate may not be punished except for conduct which violates an existing penitentiary rule or regulation.

(b) Any inmate accused of infraction of an existing penitentiary rule or regulation shall be given written notice of the charge against him, which notice shall identify the prison rule alleged to have been violated and

sions. *See* Schack v. Wainwright, 391 F.2d 608 (5th Cir. 1968) (inmate's right to have his mail relating to legal proceedings sent "postage prepaid by certified mail—return receipt requested,") ; Heft v. Carlson, 489 F.2d 268 (5th Cir. 1973) (inter-institutional correspondence) ; O'Brien v. Blackwell, 421 F.2d 844 (5th Cir. 1970) (exhaustion of administrative remedies in mail suits).

13. The thrust of the defendants' appeal was directed towards those ingredients in the district court's judgment which would require substantial expenditures to implement. The Appellants Brief, at p. 5 states:

"The defendants-appellants have already promulgated rules and regulations concerning the censorship of mail, use of corporal punishment, and the discipline of inmates and disciplinary confinement. However, the monumentus task that remains concerns the elimination of the armed trusty system, improving physical facilities, classification of inmates, inmate protection and improvement of medical facilities. All of these will necessarily require funds: funds that will necessarily have to be supplied by the Legislature of the State of Mississippi."

be served upon the accused at least 24 hours prior to the hearing.

(c) The accused must be afforded an opportunity to appear before a tribunal to respond to the charge. In no event shall the person bringing the charge serve on the disciplinary tribunal which conducts the hearing."

The district court further ordered that the prison officials, not later than November 20, 1972, compile comprehensive regulations governing misconduct which apprise inmates of:

"(a) Conduct which constitutes a breach of discipline;

(b) The penalties and sanctions which may be imposed for such conduct;

(c) A complete statement of the procedure by which such determination shall be made."

The February, 1973 handbook promulgated by the Mississippi Penitentiary Board contained extensive rules regarding inmate disciplinary procedures. The rules first set forth (1) prohibited acts constituting major violations, (2) prohibited acts considered minor violations, and (3) the respective disciplinary action for each type of violation.[14]

14. The following acts were prohibited and would be dealt with as *major* violations:

"1. Killing.
2. Assaulting any person.
3. Fighting with another person, except in self-defense.
4. Extortion, blackmail, demanding or receiving money or anthing of value in return for protection against others, to avoid bodily harm, or under threat of informing.
5. Engaging in sexual acts with others.
6. Escape.
7. Attempting or planning escape.
8. Setting a fire.
9. Willfully or maliciously destroying, altering, or damaging state property or the property of another person.
10. Stealing (theft).
11. Unauthorized possession or distribution of any explosive or any ammunition.
12. Unauthorized possession or distribution of a gun, firearm, weapon, sharpened instrument, knife, or tool.
13. Unauthorized possession, introduction, or use of any narcotics, narcotic paraphernalia, drugs, or intoxicants not prescribed for the individual by the medical staff.
14. Rioting.
15. Encouraging others to riot.
16. Engaging in or encouraging any group demonstration or conduct which disrupts or interferes with the security or orderly running of the institution.
17. Counterfeiting, forging, or unauthorized reproduction of any article or identification, money, security, or official paper.
18. Making intoxicants.
19. Gambling.
20. Preparing or conducting a gambling pool.
21. Giving or offering any staff member a bribe, or anything of value.
22. Conspiring with or aiding another person to to commit any of the above offenses shall be considered the same as a commission of the offense itself."

The following acts were prohibited and would be dealt with as *minor* violations:

"23. Threatening another with bodily harm or with any offense against his person or his property.
24. Making sexual threats to another.
25. Indecent exposure.
26. Wearing a disguise or mask with the intent to violate prison rules and regulations.
27. Willfully or maliciously destroying or otherwise interfering with any locking device.
28. Misuse of authorized medication.
29. Unauthorized possession of money or currency.
30. Loaning of property or anything of value for profit or increased return.
31. Possessing any officer's or staff clothing, unless specifically authorized.
32. Refusing to work.
33. Encouraging others to refuse to work, or participation of work stoppage.
34. Refusing to obey an order of any staff member.
35. Unexcused absence from work or any other assignment.
36. Malingering, feigning an illness.
37. Using abusive or obscene language that disrupts or interferes with the security or orderly running of the institution.
38. Lying, or providing a false statement to a staff member.
39. Being in an unauthorized area without official permission.
40. Willfully using any equipment, machinery, or vehicle which is not specifically authorized.
41. Willfully using any equipment or machinery contrary to instructions or posted facility standards.

42. Failing to stand count, unless officially excused.
43. Interfering with the taking of count.
44. Being intoxicated (alcohol).
45. Smoking where prohibited.
46. Tattooing or self-mutilation.
47. Unauthorized use of telephone or violation of mail regulations.
48. Violation of visiting regulations.
49. Giving money or anything of value to, or accepting money or anything of value from, another inmate, a member of his family or his friends without prison written approval (see Article 7).
50. Removing or having in your possession any eating or cooking utensil from the dining room or kitchen without authorization.
51. Conspiring with or aiding another person to commit any of the above minor offenses shall be considered the same as a commission of the offense itself."

The following disciplinary action was prescribed for *minor* violations:

"Whenever an inmate is found guilty of a minor violation, he may be subjected to one or more of the following disciplinary actions with the approval of the Superintendent. The disciplinary action taken will be individualized in keeping with such factors as the offender's past history, institutional adjustment, motivation, and attitude. For any offense within a twelve-month period, the maximum punishment is set forth; however, the council may recommend less than the maximum depending on the individual facts and circumstances surrounding the violation.

(a) FOR A FIRST OFFENSE WITHIN A TWELVE–MONTH PERIOD:
1. Reprimand.
2. *Loss of six days good time.*
3. Loss of plasma privileges for one thirty days.
4. Loss of visiting privileges for one Sunday.

(b) FOR A SECOND OFFENSE WITHIN A TWELVE–MONTH PERIOD:
1. *Loss of twelve days good time.*
2. Loss of plasma privileges for two months.
3. Loss of visiting privileges for one month.

(c) FOR A THIRD OFFENSE WITHIN A TWELVE–MONTH PERIOD:
1. *Seventy-two hours in isolation.*
2. *Loss of twenty four days good time.*
3. Assignment for thirty days of time to a camp where the following privileges are not available.
 a. Television.
 b. Radio.
 c. Movies.
 d. Commissary privileges.
 e. Handicraft work.
 f. Use of the regular library.
 g. Visiting privileges.
 h. Athletic program.
 i. Plasma privileges.
 j. Free tobacco.

(d) FOR ANY OFFENSES AFTER A THIRD OFFENSE WITHIN A TWELVE–MONTH PERIOD, THE PUNISHMENT WILL BE THE SAME AS CAN BE GIVEN FOR A THIRD OFFENSE." (Emphasis supplied).

The following disciplinary action was prescribed for *major* violations:

"Whenever an inmate is found guilty of a major violation, he may be subjected to one or more of the following disciplinary actions with the approval of the Superintendent. The disciplinary action taken will be individualized in keeping with such factors as the offender's past history, institutional adjustment, motivation, and attitude. For any offense within a twelve-month period, the maximum punishment is set forth; however, the council may recommend less than the maximum depending on the individual facts and circumstances surrounding the violation.

(a) FOR A FIRST OFFENSE WITHIN A TWELVE–MONTH PERIOD:
1. *Seventy-two hours in isolation.*
2. *Loss of six days good time.*
3. Loss of plasma privileges for thirty days.
4. Loss of visiting privileges for one Sunday.

(b) FOR A SECOND OFFENSE WITHIN A TWELVE–MONTH PERIOD:
1. *Seventy-two hours in isolation.*
2. *Loss of six days good time.*
3. Loss of plasma privileges for two months.
4. Loss of visiting privileges for one month.
5. *Confinement for a period not to exceed twenty-four hours in the dark hole,* said period of time will be a part of the seventy-two hours that the inmate may be in isolation.

(c) FOR A THIRD OFFENSE WITHIN A TWELVE–MONTH PERIOD:
1. *Seventy-two hours in isolation.*
2. *Loss of twenty-four days good time.*
3. Assignment for thirty days of time to a camp where the following privileges are not available:
 a. Television.
 b. Radio.
 c. Movies.
 d. Commissary privileges.
 e. Handicraft work.
 f. Use of the regular library.
 g. Visiting privileges.

The February, 1973 regulations also contained the following procedures for administratively handling infractions of these disciplinary rules:

"S302. ADMINISTRATION OF DISCIPLINE OF INMATES. Inmate discipline shall be administered by a Disciplinary Council consisting of three employees. These three employees shall be members of a nine man group designated by the Superintendent to serve on the Disciplinary Council. The Disciplinary Council shall consider and dispose of minor matters of discipline where no danger to safety, property, or life exists, as well as the more serious and persistent violations of institution rules. In addition, any inmate who is involuntarily removed from the general prison population shall, upon request, be afforded the disciplinary hearing procedure as set forth below.

"S303. DISCIPLINARY COUNCIL PROCEDURE. Inmates appearing before the Disciplinary Council are entitled to the assistance of a counselor if they so desire. Counselors shall be employees of the institution designated by the Superintendent to serve in that capacity when so requested. Any inmate may not be punished except for conduct which violates an existing penitentiary rule or regulation. Any inmate accused of infraction of an existing penitentiary rule or regulation shall be given written notice of the charge against him, which notice shall identify the prison rule alleged to have been violated and be served upon the accused at least 24 hours prior to the hearing. The accused will be afforded an opportunity to appear before a tribunal to respond to the charge and be present with a counselor if he so desires during the entire hearing. The *counselor shall call necessary witnesses* for the accused inmate *if the counselor deems* the witnesses' testimonies as necessary for the disposition of this matter. In no event shall *the person bringing the charge* serve on the disciplinary tribunal which conducts the hearing." (Emphasis supplied).

Similar to the mail portion of the district court's order, the appellant prison officials here, although technically appealing from the trial decision in its entirety, do not set forth specific challenges to disciplinary procedures ordered. Moreover, the recent decision in Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L.Ed.2d 935 (1974), not only puts to rest any doubt regarding the necessity of the revisions in Parchman's disciplinary procedures ordered by the district court here, but also raises the likelihood that even further procedural requisites in Parchman's disciplinary rules could be required by the district court.

The Supreme Court in *Wolff* held that the forfeiture of the state's statutorily created good time credits for serious misbehavior by the inmate must be accompanied by certain minimal due process requirements (though not the full range of procedures mandated in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973): (1) twenty hours advance written notice of the claimed violation; (2) a written statement of the fact findings as to the evidence relied upon and the reasons for the disciplinary action taken; (3) permitting the inmate facing disciplinary proceedings a restricted right to call

---

h. Athletic program.
i. Plasma privileges.
j. Free tobacco.

4. *Confinement for a period not to exceed twenty-four hours in the dark hole,* said period of time will be a part of the seventy-two hours that the inmate may be in isolation.

(d) FOR ANY OFFENSE AFTER A THIRD OFFENSE WITHIN A TWELVE–MONTH PERIOD, THE PUNISHMENT WILL BE THE SAME AS CAN BE GIVEN FOR A THIRD OFFENSE."

witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals; and (4) allowing illiterate inmates, when the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, to seek the aid of a fellow inmate or another person on the prison staff. The Court sounded the final caveat that its decision at this point was "not graven in stone," but that "as the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court." 418 U.S. 572, 94 S. Ct. 2982.

 In addition, for our purposes here, one further segment of the Supreme Court's *Wolff* decision is noteworthy and applicable. In footnote 19, the Court stated:

"Although the complaint put at issue the procedures employed with respect to the deprivation of good time, under the Nebraska system, the same procedures are employed where disciplinary confinement is imposed. The deprivation of good-time and 'solitary' confinement are reserved for instances where serious misbehavior has occurred. This appears a realistic approach, for it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those that must be extended when solitary confinement is

at issue. The latter represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good-time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good-time would also be required for the imposition of lesser penalties such as the loss of privileges."

This footnote is particularly significant in the instant case for under the new Parchman regulations, prisoners can lose their statutory good-time credits and be subjected to solitary confinement for all misconduct violations. *See, infra* n. 14 (p. 1315) where the potential disciplinary action is set out in full. Therefore, we easily conclude that in the instant case since the disciplinary sanction always potentially involves some degree of loss of good-time and/or solitary confinement, the minimum procedural requisites discussed in *Wolff* are required.[15]

The issues thus become (1) whether the district court's order here incorporated all of the procedural requisites mandated in *Wolff* as attendant to disciplinary proceedings involving loss of good time and solitary confinement and (2) whether the procedures actually included in the district court's order were constitutionally required. The district court required the appropriate twenty-four hours written notice of charges and

15. Mississippi in Miss.Code Ann. § 7944 (1971) also has provided statutorily that commutation of time for good conduct shall be granted by the superintendent, i. e., good time credit, and that the following deduction shall be made from the term or terms of sentences:

"Three (3) days per month off of the first year's sentence; four (4) days per month off of the second year of sentence; five (5) days per month off of the third year of sentence; six (6) days per month off of the fourth year of sentence;

seven (7) days per month off of the fifth year of sentence; eight (8) days per month off of the fourth year of sentence; nine (9) days per month off of the seventh year of sentence; ten (10) days per month off of the eighth year of sentence; eleven (11) days per month off of the ninth year of sentence; fifteen (15) days per month off of the tenth year, and all succeeding years of sentence. A prisoner under two (2) or more cumulative sentences shall be allowed commutation as if they were all one (1) sentence. . . ."

permitted the accused inmate to respond to the charges, but did not allow cross-examination—all compatible with *Wolff*. The district court did not, however, demand a written statement of fact findings as to the evidence relied upon and the reasons for the disciplinary action taken, and the 1973 Parchman regulations did not fill the gap regarding the written statement. In addition, the 1973 rules, although providing inmates the assistance of a counselor, permitted the counselor to call necessary witnesses for the accused inmate, if *the counselor* deemed their testimony necessary. This appears to run afoul of the *Wolff* requirement that the inmate be allowed to present documentary evidence and call witnesses, if the security of the prison is not jeopardized thereby. Finally, the 1973 Parchman rules only provide for the inmate to have the assistance of an institutional employee counselor, whereas, *Wolff* seems to permit illiterate inmates the choice of seeking the assistance of a fellow inmate or an institutional staffer in preparation of his defense to disciplinary charges. This is simply exemplary, not exhaustive, analysis of the potential issues to be resolved. For, in any event, at this juncture we simply point out these discrepancies. Since the plaintiff-inmates have not cross-appealed and since the 1973 regulations are not before us for review, we do not reach the issue of what additional requirements could be included in the district court's order under *Wolff's* holding. Also, similar to the mail issue, since the defendant prison officials, although technically appealing the decision in its entirety, have not specifically set forth challenges in their brief to the procedures included in the order, but have implemented regulations incorporating the requirements outlined in the district court's judgment, we do not reach the issue of whether all of the requirements in the judgment were constitutionally compelled. We merely affirm the action taken by the trial court and leave to the parties the initiative in suggesting any further requirements under *Wolff*.

## I. Defense of Fund Shortage: Failure to State A Claim Upon Which Relief Can Be Granted

The final catchall plea on appeal is the financial inability to implement the district court's order. Appellants' contention is that the complaint fails to state a claim upon which relief can be granted on the grounds (1) that the state legislature is a necessary party, because none of the named parties defendant can adequately carry out the nature of the relief exacted which requires expending of substantial funds which only the legislature can appropriate, or (2) that the character of the relief granted by the district court has a bearing on whether plaintiffs ever had a cause of action; that is, when relief granted is so severe that it is inappropriate, the relief should influence a decision whether the cause of action ever existed. More specifically, the particular relief to which the appellants object includes the elimination of the armed trusty system, the improvement of physical facilities, the classification of inmates, the implementation of inmate protection procedures and emendation of medical facilities. The appellants claim they do not have the authority nor the funds to recruit, employ, train and equip 150 new employees at an estimated cost of 1.4 million dollars annually prior to June 20, 1973, nor to construct or renovate the physical facilities. The United States, as appellee-intervenor, views the question similarly: whether the relief granted was within the discretion of the trial court.

Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts. In Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971), an installment of the Arkansas prison litigation, the district court stated:

"Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what

the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. *If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States."* 309 F. Supp. at 385. (Emphasis supplied). *See* Watson v. City of Memphis, 373 U. S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed. 2d 529 (1963) (" . . . vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny [them] than to afford them."—desegregation of public parks); Rozecki v. Gaughan, 459 F. 2d 6, 8 (1st Cir. 1972) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations." —prison heating system); Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . . ."—rehabilitative devices); Hamilton v. Love, 328 F.Supp. 1182, 1194 (E.D.Ark.1971) ("Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights."— pre-trial detention unit). On the contrary, appellants cite no cases in support of their contention that the relief fashioned by the trial court cannot be granted.

It seems that the most onerous aspect of the district court's judgment, as far as the State of Mississippi is concerned, is that compliance will cost the State a considerable amount of money. *But the district court did not require that the legislature appropriate monies for prison reform; it simply held, in keeping with a plethora of precedent on the fund shortage problem, that if the State chooses to run a prison it must do so without depriving inmates of the rights guaranteed to them by the federal constitution.* Mississippi wants this Court to hold that the conditions described in the district court opinion should be al-lowed to continue until funds needed to correct them are available and the Legislature acts on appropriations. This position is unsupported by the law and even more untenable in light of the fact that one million dollars has already been made available by LEAA, to meet some of the most pressing needs including installation of facilities to alleviate immediate health and safety hazards, the employment of additional guards, and installation of necessary sanitary facilities. In addition, we have recognized the power of the district court to prescribe remedial relief in the area of medical and physical facilities, but have refrained at this stage from delineating precisely what innovations would be constitutionally compelled. However, that determination, if eventually necessary to be made, will focus on what are the minimal constitutional health standards to be supplied and not on what funds are available to operate the prison. Furthermore, even the Mississippi legislature has called for the elimination of the trusty system by July 1, 1974, and we also have held that the trusty system, as constituted and practiced at Parchman, effected cruel and unusual punishment in contravention of the Eighth Amendment.

 Therefore, we cannot agree that the relief here granted was impermissible. Having found these numerous constitutional violations, which were even conceded by the appellants, the court had the duty and obligation to fashion effective relief. In such circumstances, the trial court is allowed wide discretion. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Board of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed. 2d 554 (1971). The relief ordered by the trial court was tailored to alleviate the deplorable practices and conditions at Parchman. Shortage of funds is not a justification for continuing to deny citizens their constitutional rights.

### J. *Change of Officials*

The appellants contend that because individuals who are presently Governor, Superintendent and members of the Penitentiary Board are not the same individuals holding these positions when this suit was commenced, they are not now subject to the trial court's order. That the individuals now holding those offices may not be the same as those in office when this suit was commenced is immaterial for purposes of this appeal since the defendants were sued in their official, not their individual capacities, and it is only in their official capacities that they are constrained by the district court's order to act. In addition, the complaint was not only filed against the named individuals, but also against "their successors."

### K. *Good Faith Actions Warrant Setting Aside Judgment?*

Lastly, the appellants urge that their good faith actions in initiating the ordered reforms at Parchman, following entry of the district court's order, make the harsh and extensive order of the district court now inappropriate. It is pointed out that steps are underway to improve the prison facilities and that the Governor and other state officials have pledged to create a model prison. The appeal to this Court is that since improvements are being implemented in the condition and operation of Parchman, the order of the district court should be set aside and "the defendants should be left to operate their own state prison."

Changes made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended. In United States v. Oregon State Medical Society, 343 U. S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952), the Supreme Court stated:

"When defendants are shown to have settled into a continuing practice . . . courts will not assume that it has been abandoned without clear proof. . . . It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."

The past notoriety of the protracted inhumane conditions and practices at Parchman reveals the necessity for the continuance of the injunctive order of the district court. It is significant that the improvements made at Parchman were not undertaken until after the filing of this suit. Although good faith may be relevant in determining whether defendants have complied with the order of the court, it certainly is not a ground upon which to seek modification of that order.

While recognizing that steps have been taken, since the filing of this suit, to improve conditions at Parchman, it is evident that much is left to be done before Parchman is operated in accord with the constitutional requirements set out in the district court's judgment. In fact, it is noteworthy that on August 22, 1973, the court found it necessary to establish the office of federal court monitor to check all the phases of prison administration, management and operation of Parchman and to determine the degree of compliance with provisions of its order dated October 20, 1972. The appointment of a federal monitor, based upon inmates' motion alleging civil contempt by the state in failing to comply with the order, certainly casts doubt upon the good faith compliance asserted by the defendants.

As a final resort the appellants, listing a number of quotations, assert that federal courts should not meddle in the internal affairs of state prisons and that matters of prison administration are to be left to the states, not dictated by federal courts. But this is not a situation where minutiae of prison administration are at issue. This case was submitted on an agreed record with gross constitutional violations admitted. The prompt and peremptory response of

the district court to these issues was totally justified and was within its broad discretion and power to fashion equitable remedies. That it may be inconvenient or more expensive for the State of Mississippi to run its prison in a constitutional fashion is neither a defense to this action or a ground for modification of the judgment rendered in this case.

### IV. CONCLUSION

Based upon the court's exhaustive investigation of the operation of Parchman, it properly conducted a special hearing on the proper forms and measure of relief to be granted, and then realistically composed part of the remedy as (A) immediate and intermediate relief, and fashioned another segment of the remedy as (B) long range relief. In view of the lengthy analysis by the district court, we adopt the court's findings of fact and conclusions of law as our own and affirm the judgment.

Judgment affirmed.