Michael V. COSTELLO, Roberto K. Celestineo, and all those similarly situated, Plaintiffs,

v.

Louie L. WAINWRIGHT, as Director of the Division of Corrections, et al., Defendants,

United States of America, Amicus Curiae.

Nos. 72–109–Civ–J–S, 72–94–Civ–J–S.

United States District Court, M. D. Florida, Jacksonville Division.

May 22, 1975.

Tobias Simon, Elizabeth J. du Fresne, Miami, Fla., for plaintiffs.

Raymond W. Gearey, Jerry E. Oxner, Asst. Attys. Gen., Dept. of Legal Affairs, Civ. Div., Tallahassee, Fla., for defendants.

David J. W. Vanderhoof, Atty., Institutions Section Civil Rights Div., United States Dept. of Justice, Washington, D. C., for amicus curiae.

## ORDER AND PRELIMINARY INJUNCTION AND OPINION

CHARLES R. SCOTT, District Judge.

This cause came before the Court with respect to the plaintiffs' renewal of application for injunction to close prisons to additional entrants, filed herein April 21, 1975. The plaintiffs seek to have this Court close Florida's prison system to additional entrants and, in addition, require that the current inmate population be reduced to acceptable levels consistent with constitutional standards. For the reasons set forth below, the Court will require the defendants to lower the inmate population of the Division of Corrections to so-called "emergency capacity" within one year of the date of this order and preliminary injunction and to normal capacity by December 1, 1976.

## I. BACKGROUND

The basic claim in these two consolidated cases may be summarized as follows: that the Florida Division of Corrections and the Florida Division of Mental Health "do not provide adequate hospital beds, ambulances, doctors, psychiatrists, nurses, psychologists, medical technicians, nor the balance of the needed personnel and equipment necessary to care for the physically and mentally ill among the prisoners in their custody; that the plaintiffs have been denied access to constitutionally acceptable medical facilities and medical personnel; that the defendants, acting under the color of law, have denied or have been unable to provide constitutionally adequate medical treatment to the plaintiffs; that the physical facilities are so grossly overcrowded as to cause deprivations of basic elements of hygiene; that as a result thereof, plaintiffs have been subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States; and have been denied due process and equal protection of the laws." Amended pre-trial stipulation, filed January 13, 1975, p. 2.

The relief prayed for by the plaintiffs is as follows: (1) a mandatory reduction of the prison population to levels "which do not exacerbate the unhealthy conditions already in existence"; (2) a mandatory requirement that the plain-

tiffs be afforded "such medical care as will protect their lives and health"; (3) an injunction from failing to provide adequate medical care to the inmates; (4) other appropriate relief, including costs and attorneys' fees. On February 22, 1973, this Court allowed this cause to be maintained as a class action.

On February 8, 1973, prompted by a proliferation in the number of inmates committed to the custody of the Division of Corrections resulting in crisis overcrowding, the plaintiffs filed an application for preliminary injunction and a motion for partial summary judgment so as to restrain the defendants from accepting additional inmates into any of the existing institutions of the Division of Corrections pending further order of this Court. At that time, the normal capacity for the existing institutions of the Division of Corrections was seven thousand (7,000) persons with an "emergency" (as described by the defendants themselves) capacity of eighty-three hundred (8,300) inmates. The actual inmate population on February 8, 1973, was approximately ten thousand three hundred (10,300). The Lake Butler Reception and Medical Center, which was designed for seven hundred (700) inmates, actually had a population of thirteen hundred (1,300). On February 13, 1973, the Court denied the application for preliminary injunction without prejudice, on the basis that the defendant Director of the Division of Corrections, Louie L. Wainwright, had himself closed the prison system to additional inmates because of the danger to the health and lives of the inmates:

> It is clear that at this time, the relief sought by the Plaintiffs' application for a preliminary injunction is moot. Therefore, this Court denies, without prejudice, the Plaintiffs' Application for a Preliminary Injunction. In so doing, this Court does not express or intimate any disposition whatsoever as to the merits of the issues raised in the Plaintiffs' Application for Preliminary Injunction . . .

Because the defendant Wainwright lifted his ban on the entry of new prisoners into the system, the plaintiffs, on March 1, 1973, renewed their application for a preliminary injunction to enjoin overcrowding in the prisons. That motion, which was renewed more than two years later, is the subject of this order and preliminary injunction.

## II. THE CURRENT CRISIS

In late 1974, the defendant Wainwright, for the third time, temporarily closed the prison system to additional entrants but shortly thereafter rescinded that action under strict orders from the Governor. From December 31, 1974, to March 31, 1975, a span of only three months, the total inmate population of the Florida Division of Corrections increased from eleven thousand four hundred and twenty (11,420) to twelve thousand seven hundred and forty eight (12,748), the normal capacity being ninety-three hundred and thirteen (9,313) persons. At Lake Butler Reception and Medical Center, within the same period, the inmate population increased from eleven hundred and ninety-five (1,195) to thirteen hundred and eighty-five (1,385). On April 24, 1975, the date this Court personally inspected the Reception and Medical Center, the population at that institution stood at fourteen hundred and fifty-nine (1,459). On April 29–30, 1975, when the population at the Reception and Medical Center was fifteen hundred and fourteen (1,514), a racial disturbance broke out there which resulted in minor injuries to about twelve (12) inmates.

On May 13, 1975, the Division of Corrections, in desperation for additional housing facilities at Lake Butler Reception and Medical Center, began to house inmates in a so-called "tent city" on the athletic field adjacent to the Florida State Prison at Starke. On the basis of an ore tenus motion made at the trial on May 12, 1975, the plaintiffs seek to enjoin the use of these tents as a means of housing inmates on the

grounds that those inmates are being subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. For the reasons set forth in section VII of this opinion, this Court will deny this *ore tenus* motion.

## III. THE DENIAL OF ADEQUATE MEDICAL CARE AND THE CORRELATION BETWEEN SEVERE OVERCROWDING AND THE DANGER TO THE LIVES AND HEALTH OF THE INMATES

·On July 10, 1973, this Court appointed Doctor Kenneth B. Babcock[1]: (1) to serve in his professional medical capacity as expert special master of this Court (along with Doctor Joseph Alderete[2] and others) by organizing, directing and conducting a comprehensive health services survey of all correctional institutions and road camps maintained and operated by the Division of Corrections; (2) to report his findings to the Court on the entire spectrum of health care services rendered to the inmates in custody of the Division of Corrections; and to report, as a matter of professional medical expert opinion, those remedial measures, if any, which were medically necessary to insure a minimally necessary medical program and system of health care to the inmates committed to the custody of the Division of Corrections.

The gist of the Babcock Commission Report, which was filed herein December 19, 1973, was that there existed gross systemic deficiencies in the delivery of adequate medical care to the inmates of the Division of Corrections, which deficiencies could be remedied by certain specific measures outlined in the report. On May 28, 1974, the defendants filed a response to the Babcock Report in which they concurred generally with the findings of the Babcock Commission Report and the remedies proposed therein.

In the amended pre-trial stipulation, filed herein January 13, 1975, the plaintiffs and defendants stipulated that "the Plaintiffs are not receiving such medical treatment as would be required by guidelines based upon the Babcock Report for the availability of mental and physical health care and treatment."[3]

1. Doctor Babcock is a physician with a master's degree in hospital administration who is presently acting in the capacity of an independent consultant for hospitals and medical physicians. He spent over 10 years as a director of the Joint Commission on Accreditation of Hospitals and, since his retirement therefrom in 1964, has surveyed hundreds of hospitals, in hospital consultant capacity, to determine if they conformed to the standards established by the Joint Commission. Beginning in 1968, he began a survey for the Florida Division of Corrections of all the major penal institutions in Florida. The appointent of Doctor Babcock was not objectionable to any of the parties to this litigation.

2. Doctor Joseph Alderete is the hospital director and chief medical officer of the United States Penitentiary at Atlanta, Georgia. Doctor Alderete is trained as a psychiatrist and a surgeon, and besides his position as hospital director, he engages in the practice of both surgery and psychiatry. He was Chief of the Psychiatric Service at the United States Medical Center for Federal Prisoners in Springfield, Missouri. He re-

ceived a one year appointment to Harvard Medical School as a Clinical and Research Fellow in electroencephalography. He holds an appointment with Emory University Medical School in Atlanta as a clinical instructor in psychiatry. In addition, interestingly enough, he was a correctional officer at the federal institution in LaTuna, Texas, prior to his entry into medical school. Doctor Alderete also testified as an expert witness in the case of *Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. den.* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

3. *Id.* at p. 7. In the original pre-trial stipulation, filed herein December 6, 1974, the plaintiffs and defendants stipulated that ". . . the Plaintiffs are not receiving such medical treatment as would be required even by minimal Constitutional standards for the availability of mental and physical health care and treatment." *Id.* at p. 8. The original pre-trial stipulation was rescinded and the amended pre-trial stipulation was substituted therefor because of what appeared to be intense political opposition to the original pre-trial stipulation.

The plaintiffs and defendants also stipulated "that the Babcock Commission Report as modified by the Response of the Division of Corrections describes necessary improvements to the delivery of medical services within the prison system which, if implemented, would either: (A) Create guidelines for adequate medical care (Defendants' position) or (B) Be a major factor in meeting minimal constitutional standards (Plaintiffs' position)." [4] Most importantly for purposes of the application for preliminary injunction, the parties stipulated that "severe overcrowding may be injurious to the physical and mental health of the Plaintiffs and such overcrowding should be eliminated." [5]

The foregoing stipulation as to the link between severe overcrowding and the denial of adequate health care is based on uncontroverted expert medical opinion. In his deposition of February 8, 1975, in open court, psychiatrist Francis Gerard Walls,[6] an employee of the defendant Division of Corrections, testified as follows (beginning at page 24 thereof):

### CROSS EXAMINATION
### BY MR. DEARING:

Q Dr. Walls, did I understand you correctly to respond to Ms. du Fresne's questions that it is at present with—it is your opinion, your medical opinion, professional opinion that at this present time the fact of overcrowding conditions at the Lake Butler Reception Center has a detrimental effect on the mental and physical health of the inmates kept there?

A Yes, sir, that would be my opinion. There are too many people in too small an area and too tense an atmosphere, the tenseness added to by many of them being the first time in a prison system. They're tense anyway and you add to this the fact of crowding, the fact of fear, the fact of having to wait for food and having to sleep in places for one where there are three or four, the whole thing builds up this personal fear, of panic, of homosexuality, of being hurt physically, of being subject to conversations which they would not be subject to if they were more spread apart, by being subject to—with all due respects—to great racial tension. Some people have never been mixed with others of ethnic—different ethnic colors before and they just don't—they just cannot tolerate it as an individual being closed up with three or four others of different pigmented skin color and different outlooks and all this adds to it. The great numbers that are concentrat-

---

4. *Id.* at p. 8. The original pre-trial stipulation stated:

 The parties recognize that the Babcock Commission Report describes necessary improvements to the delivery of medical services within the prison system which, if implemented, would either:
 A. Meet minimal Constitutional standards (Defendants' position), or
 B. Be a major factor in meeting such minimal Constitutional standards (Plaintiffs' position).

 The parties recognize that the Babcock Commission Report needs to be implemented and to this end, the parties have determined:
 A. what would be a sound, medical aministrative organization;
 B. what would be an adequate number of qualified personnel; and
 C. what would be the necessary improvements to old, and the construction of new, facilities as to carry forward the recommendations of the Babcock Commission Report.

5. *Id.* at p. 12. The original pre-trial stipulation stated:

 The parties recognize that overcrowding of the nature herein described *is* injurious to the physical and mental health of the Plaintiffs and such overcrowding *must* be eliminated. [emphasis added]

6. Doctor Walls was educated basically in England, until he came to the United States in 1958. He did his residency in psychiatry and neurology in Virginia. He taught in a university in Canada until he returned to Florida in 1965. He was Chief of Psychiatry at Chattahoochee State Hospital until 1971 and then was Acting Superintendent there until May 1972 when he was transferred to the Division of Corrections to set up a Department of Psychiatry at the Lake Butler Reception and Medical Center. He is Board eligible in the American Board of Psychiatry and Neurology and has a Doctorate of Philosophy. He is qualified as a physician in Great Britain, Ireland, Canada and the United States.

ed there on a 19 year old boy the first time away from home, you know we have lots of 19 year old boys.

Q Could you—you have been speaking in generalities and I'm sure that your theories and your conclusions are based upon actual case histories.

A Yes, sir.

Q Could you describe, is there a specific instance you could describe whereby the overcrowded conditions led directly to? [Dr. Walls cited a specific instance]

\* \* \* \* \* \*

Q You mentioned racial conflicts. Do you have a specific case that you can relate to us that was brought about by these overcrowded conditions?

A Well, when fifteen people of one color jump on another of another color and kick him in the face and break his jaw and smash a cheekbone and no one sees it and everyone turns the other way because there are that many people around, it's a dangerous procedure to—

Q And is this—and is this—

A This happened.

Q This is a case that you're referring to specifically that—

A Yes, sir.

Q When did that happen?

A Either last Sunday or the Sunday before.

Q Just very—

A Just very recently.

Q Is it fair to say that the increase of inmates coming into the Reception Center makes this situation more acute, more difficult?

A Oh, yes; yes, you see, it is not just the numbers coming in, it's the numbers that have to stay there because there's no outlet to send them to that's appropriate.

\* \* \* \* \* \*

BY MR. DEARING:

Q Dr. Walls, is it your opinion that the medical conditions, physical and psy-chological and psychiatric well-being of the inmates in the present overcrowded conditions at Lake Butler would be helped in any great way if inmates were ceased to be taken there or they held off taking any more inmates into the Reception Center at this time?

A I think so long as they leave 1,300 people there, it's not going to be any advantage and I think if the number since I—I think the numbers when I went there in May were about a thousand. They've gone up 300 in the few months and if that's going to continue, the tenseness is going to get much greater. It's not just a matter of closing the doors and say "Now we've got 700, open the door." We're going to have to arrive at an acceptable figure that can be handled satisfactorily from everyone's point of view. The over-worked staff are going the best with what they have. The inmates are cooperating quite well, the vast majority, but I don't think there's one answer. I don't think it's just one summary answer. I think there are too many facets involved.

Q You characterized the Reception Center as being a tinder box?

A Yes.

Q Would you amplify that.

A Well, in actual fact, I think if the number of inmates got together and decided they're going to get out of this place, there's insufficient staff, custodial staff to stop them.

Q You are referring then to the possibility of a riot?

A Riotous situations are always on hand, at all times, and the guards are not armed. They are walking about there with their life in their hands just wearing slacks like I do. They have no type of guarding instrument. They don't carry anything. They're walking around with—there's 179 patients, I think, inmates on each ward where they're sleeping. I think it's for about 80 or 90 and there are two custodial of-

ficers who could just take them apart.

Q Do you have any professional opinion based upon your observation of these custodial officers as to their state of mind?

A Well, I do, I know quite a few of them are very easily upset. I see quite a few of them and talk to them and they get worried and upset. Many of them talk about leaving.

Q Do you understand the term "battle fatigue"?

A Yes, I do, very much so.

Q Do they have the symptoms of what we used—

A Yes, they have so many complaints that you can't find any grounds for clinically, come in with headaches or back aches and all the rest, sinus trouble and you do Xray and you can't find a thing and they say they're tensed up and they just look tired out like most of us do.

Q Are they short tempered?

A Some are; the vast majority of them must be saints to work and take what we do.

Q Would you say that this condition that they suffer is directly attributable to the overcrowding?

A To the numbers, to the numbers. It's just continuous, going, going all the time from the word—from the moment they come in with 60 or 70 at a time. It's always—there's just no letup. The whole thing is just snowballing. Something has to give. It's unfortunate—I don't mean to be a prophet but it's usually someone gets killed in these situations. It has happened in other prisons. And then someone takes notice.

Q Have you discussed this problem with Mr. Wainwright or the other administrators?

A Not directly, no. I know Mr. Cook, our Superintendent, who is in Tallahassee, also is fully aware of it. We've all discussed it.

Q Have you discussed the possible solution to the problem?

A No, because I only know partial solutions, you know. I really don't see the whole picture. I don't know the outlook problem, but I'm quite sure there's an outlook problem as well as there is an intake problem. Without speaking out of turn, I think the intake problem is really something out of—directly out of our hands. It's in the hands, with all due respects, to the Courts with the pre-sentence investigations. We have a different system in England and I think it helps a little better.

\* \* \* \* \* \*

Q Well, if I may sum up then, Doctor, it is your professional opinion that the conditions, the overcrowding conditions at the Reception Center are such that they are detrimental to the physical and psychiatric wellbeing of the inmates there at the present time—

A At this time.

Q —and that it's being aggravated by the continued acceptance of inmates at the Reception Center?

A Yes, sir.

Q And that if the inmates were—if the Reception Center were closed down to new inmates, it would at least to that extent assist you in your program?

A Yes, sir, it definitely would.

MR. DEARING:

Thank you very much, sir.

\* \* \* \* \* \*

Thus, one of the defendant Wainwright's own employees testified, in effect, on the basis of his own expert medical opinion, that a reduction in the present inmate population would be an effective interim vehicle to prevent further exacerbation of the dangers to the "physical and psychiatric wellbeing of the inmates," (if not, in fact, to prevent a full scale prison riot, because of the "tinderbox" conditions which existed then and continue to exist).

Doctor Wall's testimony as to the effect of severe overcrowding on the physical and mental health of the inmates was corroborated by the deposition testimony (in open court) of Doctor Kenneth

Babcock, the expert special master appointed to head the so-called Babcock Commission, as described previously. His testimony was as follows (upon direct examination by plaintiffs' counsel):

Q Could you tell us whether there is any danger of epidemic of contagious diseases in prisons that is any different from that of the free world community?

A If there is overcrowding especially and there is close confinement in prisons, there is much more liability to epidemics. We have recent cases of such like the meningitis epidemic at Fort Ord, California where a group of recruits were brought in. They are not too different in that they are housed in congested just like prisoners are. You've got the danger of meningitis, you—when there is overcrowding, the danger of respiratory infections such as flu and pneumonia with your overcrowding. They are so mixed and so confined that the danger is much greater. There is also the danger of food poisoning and other things like that if the proper food is not given them and with the high rate of carbohydrate foods, there is much greater chance of fermentation and things like that to produce gastrointestinal upsets.

Q Assuming that you have a situation in which a—can you at any time justify from a health point of view at an overcrowded prison, a prison that has more persons than the prison was built to hold by ACA standards and by prison standards generally?

A I cannot justify it from a Public Health medical hospital standards. The standards of the HEW, of the armed forces, of the Hospital and Medical Association is 100 square feet and the Public Health Service is 100 square feet per single occupancy of a room and 80 square feet per unit in a multiple unit, that is, of two or more beds and most of the institutions in Florida, I would say the average square footage per inmate is about 30 or 40 square feet, just half of what it should be.

Q What is the effect on the mental stability of an individual when he is placed in overcrowded conditions?

A To me it merely creates a greater bitterness and a greater incompatibility with the establishment and those concerned in his care. It is not a good thing.

Q Is there a heightened degree of tension, anxiety, agressiveness?

A This would seem to be the case in many institutions that have been studied—that have been studied and I believe absolutely that it's true.

Q Is there a correlation in your opinion between overcrowding and subsequent violence?

A There has to be, yes.

Q Is there any danger as a consequence of overcrowding to the health, life, safety and limb of the correctional officer as well as the inmate?

A Well, as the tension among the inmates increases, the chances of something happening to the custodial officers in due proportion increases, in my estimation. It's like a teetertotter, the higher the crowding and the closeness together of those, the greater chance because of the fewer custodial people for trouble is paramount and is there.

Q Has it been your experience, sir, from your observation, that as overcrowding continues to increase, that there is not a proportionate increase of health and medical services?

A Well, for the most part, the infirmary or the hospital or the medical facilities were built for a known number and in all the institutions that known number has been increased considerably; also that our knowledge of the need for medical facilities increases every year and most of these facilities are anything from 10 to 35 years old.

Q So that we begin with an inadequate medical facility even for a normal population of a prison, do we not?

A That's right.

Q And overcrowding simply dilutes the availability of medical plants, equipment and services to the newcomer as well as the oldtimers?

A That is right.

\* \* \* \* \* \*

On the third day of the trial of this case on April 23, 1975, Doctor Joseph Alderete, who is Chief Medical Officer at the United States Penitentiary in Atlanta, Georgia,[7] testified as follows on direct examination by counsel for the Civil Rights Division of the United States Department of Justice:

BY MR. VANDERHOOF:

Q Doctor, one of the major problems that has been brought to the Court's attention is that of overcrowding in the Florida prison system.

Did you, when you inspected the various facilities within the prison system, review any conditions which in your professional judgment you felt were overcrowded?

A Yes, sir, we did and this varied a great deal from institution to institution. Some were terribly overcrowded; some of them were less so, but in general they were all overcrowded.

Q How overcrowded? Could you give an example or discussion of this?

A Yes, I can give an example.

In one segregation unit, for example, there was a room, it wasn't much wider than this witness box and just barely—it wasn't adequate really for one person and they had two prisoners in there, double bunked, and when you got off the bed, maybe if you were a real thin man, you could get—squeeze by the wall and bed. A person of my build—I've lost 40 pounds—couldn't.

Q Did you see overcrowded conditions in other locations, other than this example you've just stated?

A Yes, sir, the one example I gave was just one of the most glaring ones that I saw.

Q Does overcrowding create medical and mental problems?

A Yes, sir, it has a tremendous impact medically and emotionally.

Medically, it's conducive to spreading of epidemic-type diseases. It's conducive to diseases in which there's a breakdown of resistance, such as, for example, TB and the incidence of infection is—where people are really in close proximity to each other, is much greater. And finally, the—emotionally, it produces a lot of depression, frustration, activates violence, promotes aggression. When you're in an institution that's overcrowded, you can begin to feel the tension, you can almost cut it with a knife.

Now, we try to keep our institutions in Atlanta down to 2,000. From time to time, our count fluctuates and our danger signal is when it hits 2,300, and when we start getting that count, it sort—it's sort of like walking on eggs; you just don't know when you're going to crack one, and we have a plan where we try to disperse them and scatter them out to—we keep a running census of all the institutions in the United States and we try to disperse them so that we can keep the count down to the 2,000 level.

\* \* \* \* \* \*

Q And so overcrowding itself creates medical problems?

A Yes, sir.

Q In addition, it creates the potential for further medical problems?

A Yes, sir.

Q Just of itself?

A Right.

Q And in addition, if I understand your testimony, it also creates the pos-

7. His qualifications are more fully delineated in footnote 2.

sibility of lack of control, if you will. maybe violence?

A Yes, sir.

Q Which in and of themselves would create further medical problems?

A Yes, sir.

Q Okay.

Disregarding the potential for creating further medical problems, if a facility is overcrowded and it has a set medical staff, would it be your opinion that the medical staff would be extended beyond its capacity purely by reason of overcrowding?

A Yes, sir, it can be stretched too thin.

Q And then you could not adequately serve the needs of the inmates confined there?

A That's correct.

Q Thank you.

In your recommendations to the Court, did you recommend the elimination of the overcrowded conditions within the Florida prison system?

A Yes, sir.

Q Is that necessary—

A Yes, sir, it is.

Q —to provide adequate medical care?

A Yes, sir.

\* \* \* \* \* \*

Although the defendant Wainwright is not a medical expert, he did express a corroborative opinion in his in-court deposition of February 6, 1973, as to the effect of severe overcrowding upon the administration of the Florida Prison System and upon the health and well-being of the inmates committed to his custody:

Q Do you have an opinion, sir, as to whether this over-crowding leads to greater irritation among the inmates?

A I don't think there's any question but what it does. There's too many people in the institution. There is not enough people to supervise them and therefore it leads to agitation, unrest, and of course serious problems.

Q Last year at about this time, did you issue an order closing down the Lake Butler Reception Center and refusing to accept any additional prisoners?

A Yes, sir.

Q Was the number of persons at the Lake Butler Center at that time less than it is now?

A It was about the same at the Lake Butler Center. We have more in the Division than we had at that time but it's about the same in the Center.

Q Do you have any opinion as to whether or not this over-crowding constitutes a danger to the health of the inmates at the Lake Butler Center?

A Yes, sir, I think it does.

Q Is this danger from the increased danger of communicable and contagious disease?

A Yes, sir.
creased danger of fighting and violence among the prisoners themselves?

A Yes, sir.

Q Are there any other sources of this—of danger to health that I have not covered as a result of the overcrowding at the Lake Butler Center?

A Well, the sanitation of the institution in general is suffering from the tremendous over-crowding. The inability to staff or to carry out proper procedures for sanitation in the laundry and other places has caused, I think, serious problems, yes, sir.

Q Has the over-crowded condition also affected the conditions at the—each of the other eight major pris-

Q Is this danger from the in-ons?

A Yes, sir, to varying degrees.

\* \* \* \* \* \*

Q Have the support services for sanitation, laundry, food, suffered as

a consequence of these over-crowded conditions?

A Yes, sir.

Q Do you regard the over-crowded conditions as a danger to the health of the prisoners in each of these institutions?

A I think I would have to say yes.

\* \* \* \* \* \*

During the trial, Doctor Thomas E. McKell,[8] a physician internist and consultant to the Florida Department of Health and Rehabilitative Services (of which the Division of Corrections is currently a component) testified as follows upon direct examination by plaintiffs' counsel:

Q Do you have any opinion as to the effects upon the medical and mental wellbeing and—of the inmates as to this overcrowding?

A I think this cannot fail to produce both physical and emotional problems.

I think we're all aware that when you crowd too many people too closely together, you get into trouble even if they are all reasonably well behaved and have no particular grudge against society. I find this in our Emergency Department and one of the things I've done is to split our waiting rooms and get people scattered around because, in a small waiting room with many people in there, they begin to create tensions between themselves and the first thing you know, you have a first-class argument going on. By separating this and providing them about 60 waiting spaces, we have corrected this problem.

I think the prisons are obviously much worse than this because, if you have roughly twice as many people as you're equipped to house, then you've got obviously people that are quite crowded together. And I was told at the Florida State Prison that there were a good many hundreds of people in the summer of '74 who had been incarcerated within their cells for a year or more without anything other than a two-or-three times a week bath shower and a small amount of exercise. This I think would produce in anyone both physical and emotional problems. Physically, you get into a negative nitrogen, negative calcium balance. There are lots of things that can happen to you physically, demonstrable in the laboratory.

Emotionally, I think it's equally obvious that while this is not solitary confinement, it is confinement in a closed area with no opportunity for any of the usual outlets, and I think it creates more emotional problems. It leads to greater amounts of tranquilizers because the best way to pass this time is to sleep it off.

On the first day of the trial, Mr. O. J. Keller, the Secretary of the Florida Department of Health and Rehabilitative Services, testified as follows upon direct examination by plaintiffs' counsel:

Q Let me ask you about overcrowding. Do you know anything about the conditions of overcrowding in the Division of Corrections and whether or not that's causing any effect at all on the health of the inmates?

A Well, there's no question about the Division of Corrections being overcrowding. *I think that we're probably setting a record in the Unit-*

8. Doctor McKell is a physician internist who is currently acting as Director of Emergency Services at Tampa General Hospital. He is Consultant to the Florida Department of Health and Rehabilitative Services where he was formerly Medical Services Coordinator. He is a clinical professor of medicine at the University of South Florida College of Medicine. He has been on the Blue Shield Board, which is an elected position from the Florida Medical Association House of Delegates, for five years. He was intimately involved in the formation of the University of South Florida Medical School.

ed States now with regard to overcrowding. [Emphasis added]

\* \* \* \* \* \*

Q Have you drawn any conclusion as to what effects this overcrowding has on the health and well-being of the inmates?

A Well, with thé existing staff and with all of the major institutions operating over the emergency level, obviously the individual inmate would not get as much attention as he would if the institution was operating at what is considered normal or average capacity. You've got—you've got a certain number of staff there and then you've got an expanded number of inmates. I don't know that the health care of individual inmates has been jeopardized except for the fact that conditions are dangerous in prisons when they are overcrowded and if people are sleeping four to a cell designed for one man, that is certainly an unpleasant situation, and again it can be dangerous simply because of the overcrowding or of the tension that overcrowding can create.

Secretary Keller went on to testify that the prisons had been closed to further inmates three times since 1972 by the defendant Wainwright, the last time being October 1974 when the population at the Reception and Medical Center "had reached a dangerous level." He further testified that the Attorney General of Florida had given him a legal opinion that it would be illegal for either he or the defendant Wainwright to close the prisons to further entrants and that the Governor had personally ordered them not to do so.

The 1973 Florida Comprehensive Plan for the Criminal Justice System, Multi-

Year Component, at page 3–173, stated as follows:

Thus, the *first* most pressing problem is overcrowded institutions. The environment created by gross overcrowding induces a variety of dangerous conditions. Loss of control increases proportionately with population increase thus producing greater threat to the orderly management of the institutions and the surrounding communities. This condition promotes anonymity and emotional stress. It depersonalizes both the guarded and the guards. Treatment becomes less personal, less flexible, less effective. Crowding people produces a pathology that gives use to increased sexual perversions, emotional instability, social disruption, and extreme depression. The current overcrowding rate for all nine major institutions combined is 2,402 inmates over capacity. (April 1974)

See also Overcrowding in the Florida Prison System: A Technical Assistance Report (American Justice Institute, 1972) (which was submitted into evidence before the Court in February 1973 when the initial application for preliminary injunction was considered and which includes specific recommendations to alleviate the overcrowding).

█ In summary, the overwhelming evidence is that there is a direct and immediate correlation between severe overcrowding, as now exists in the Florida Prison System, and the deprivation of minimally adequate health care. In addition, it appears that severe overcrowding endangers the very lives of the inmates because of its being a factor in the causation of violence within the prison system.[9]

---

9. The inmate population in the Florida Prison System has increased as follows since 1971:

| | |
|---|---|
| June 30, 1971 | 9,530 |
| June 30, 1972 | 10,112 |
| June 30, 1973 | 10,346 |
| June 30, 1974 | 11,335 |

| | |
|---|---|
| March 31, 1975 | 12,748 |
| May 2, 1975 | 13,046 |
| May 12, 1975 | Approximately 13,700 |

Emergency capacity on May 12, 1975, was 11,105 inmates (with the recent addition of 600 beds).

## IV. *THE COURT'S PERSONAL VIEW OF LAKE BUTLER RECEPTION AND MEDICAL CENTER*

As it did in February 1973, this Court, on April 24, 1975, with counsel and members of the press, personally visited the Lake Butler Reception and Medical Center (RMC) in order to observe the overcrowded conditions. The following is a capsulization of the view taken.

On April 24, 1975, the total number of inmates at RMC was 1,459 (the previous high being 1,500 on April 17, 1975), as compared to a normal capacity of 700 inmates. Of those inmates are 284 permanent residents, the balance being transients awaiting classification or patients awaiting treatment at the medical enter. The permanent inmates are housed in two dormitories designed to house 96 inmates each for a total normal capacity of 192 (as opposed to 284 actually housed there).

The transient inmates are housed in four dormitories and 68 one-man cells. Each transient dormitory was designed to house 96 inmates but actually houses double that number: 192. Therefore, 768 inmates reside in dormitories designed for 384. The balance of the transient inmates sleep four for every one-man cell. A photograph of a typical one-man cell with four inmates is appended hereto as Exhibit "A".

Because of the lack of bedspace, 60 permanent inmates reside in the hospital (not for medical reasons) and 75 transient inmates reside in the permanent dormitories. In addition, there were 73 actual patients in the medical center. Out of the total of 1,459, only 1,331 were provided bunks, the remainder sleeping on the floors of the one-man cells.

The one-man cells were the most disturbing to the Court because, within the dimension of each one ($7' \times 7' \times 9'$), four inmates were required to sleep. The pressures were most acute when the count rose to 1,514 and the disturbance broke out on April 29, 1975. To alleviate the pressure, the Division of Corrections erected a "tent city" on an athletic field adjacent to Florida State Prison at Starke as temporary housing for approximately 250 inmates. The Court has not had the opportunity to personally view this arrangement, although there has been testimony regarding it.

The net effect, as related by the corrections personnel themselves, is that their system of classification has been substantially impaired in the face of the mounting surge of incoming inmates, thus contributing to the proliferation of rapes, assaults and tension in general. In addition, feeding the inmates has become a cumbersome, inefficient, laborious task which results in long lines, hungry inmates and flaring tempers. Furthermore, the sheer number of inmates in proportion to the limited number of correctional officers creates a definite security problem and has severely limited attempts to maintain rehabilitative programs to keep the inmates occupied. In summary, then, what the Court saw was potentially a very explosive situation.

## V. *THE APPLICABLE LEGAL PRINCIPLES*

This Court is firmly committed to the well-established principle that an inmate "retains all rights of an ordinary citizen except those expressly or by necessary implication, taken from him by law." *Jackson v. Godwin*, 400 F.2d 529, 532 (5th Cir. 1968), *quoting Coffin v. Reichard*, 143 F.2d 443, 445 (6th Cir. 1944). *See also Rhem v. Malcolm*, 371 F.Supp. 594, 622 (S.D.N.Y.1974), *aff'd and remanded* 507 F.2d 333 (2d Cir. 1974); *Sands v. Wainwright*, 357 F.

Supp. 1062, 1094 (M.D.Fla.1973), *vacated and remanded on other grounds*, 491 F.2d 417 (5th Cir. 1974); *Washington v. Lee*, 263 F.Supp. 327, 331 (M.D.Ala. 1966), *aff'd per curiam* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). "The courts have a duty to protect prisoners ' . . . from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the court.'" *Sands v. Wainwright, supra*, 357 F.Supp. at 1094, *quoting Jackson v. Godwin*, 400 F. 2d 529, 532 (5th Cir. 1968). "The prohibition against cruel and unusual punishment contained in the Eighth Amendment, applicable to the State of . . . [Florida] through the Due Process Clause of the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), is not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement that may prevail at a prison." *Gates v. Collier*, 501 F.2d 1291, 1300–1301 (5th Cir. 1974). In addition, " . . . it is apparent that the courts cannot close their judicial eye to prison conditions which present a grave and immediate threat to health or physical well being. . . . [citing cases] If the 'deprivation of basic elements of hygiene' has consistently held violative of constitutional guarantees . . . then certainly practices which result in the deprivation of basic elements of adequate medical treatment, particularly such deprivations as immediately threatens life and limb, would be equally vulnerable." *Campbell v. Beto*, 460 F.2d 765, 768 (5th Cir. 1972). Conditions of confinement that deprive inmates of adequate medical care offend "evolving standards of decency." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed. 2d 630 (1958), and are thus clearly subject to Eighth Amendment scrutiny. *Newman v. Alabama*, 503 F.2d 1320, 1330, n. 14 (5th Cir. 1974). In addition, conditions that serve to create a denial of adequate medical care to inmates con-

stitute a denial of due process under the Fourteenth Amendment. *Newman v. Alabama, supra*, 503 F.2d at 1330; *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 688 (D.Mass.1973), *aff'd*, 494 F.2d 1196 (1st Cir. 1974). *Cf. Mills v. Oliver*, 367 F.Supp. 77 (E.D.Va.1973); *Blanks v. Cunningham*, 409 F.2d 220 (4th Cir. 1969).

██ Although this Court has traditionally been reluctant to interfere with the internal operation and administration of state prisons, *Granville v. Hunt*, 411 F.2d 9 (5th Cir. 1969), it will do so where the constitutional rights of inmates are clearly being violated. *Sands v. Wainwright, supra*. The record in this case has led this Court to conclude, at least for the purposes of preliminary injunctive relief, that the defendants have been and still are operating the Florida Prison System in a manner which violates the constitutional rights of the inmates by denying them adequate medical care (as demonstrated by the Babcock Commission Report and the defendants' response thereto). *Newman v. Alabama, supra; Edwards v. Duncan*, 355 F.2d 993 (4th Cir. 1966); *Coppinger v. Townsend*, 398 F.2d 392 (10th Cir. 1968); *Schack v. Florida*, 391 F.2d 593 (5th Cir. 1968), *cert. denied*, 392 U. S. 916, 88 S.Ct. 2080, 20 L.Ed.2d 1376 (1968); *Martinez v. Mancusi*, 443 F.2d 921 (2d Cir. 1970); *Finney v. Arkansas Board of Corrections*, 505 F.2d 194 (8th Cir. 1974); *Sawyer v. Sigler*, 320 F. Supp. 690 (D.Neb.1970), *aff'd*, 445 F.2d 818 (8th Cir. 1971); *Battle v. Anderson*, 376 F.Supp. 402, 424 (E.D.Okl. 1974).

The record in this case, at least for purposes of preliminary injunctive relief, indicates that the defendants have violated their affirmative duty to establish a medical care delivery system which is designed to meet the routine and emergency health care needs of the inmates committed to their custody.

*Newman v. Alabama, supra; Fitzke v. Shappell, supra; Campbell v. Beto, supra; Finney v. Arkansas Board of Corrections, supra.* This is true despite the fact that the defendants have contended, without proof as yet, that the gross systemic deficiencies in the delivery of adequate medical care noted in the Babcock Commission Report have been partially eliminated.

Furthermore, the evidence is clear that the systemic deficiencies in the delivery of adequate health care have been greatly exacerbated by extremely severe overcrowding that has resulted in an overall inmate population level in excess of 2,500 above "emergency" capacity. The testimony indicates a direct correlation between severe overcrowding and the deprivation of adequate health care on one hand and a positive relationship between severe overcrowding and violence and brutality on the other.

By the defendants' own definition, which was adopted from the American Justice Institute's Report on *Overcrowding in the Florida Prison System,* "[emergency capacity] represents the population beyond which the institution must be considered critically, and quite probably, dangerously overcrowded. It includes every bed in the institution which it is judged can safely be occupied at times of peak populations either due to intermittent and unpredictable population surges or to emergency and temporary circumstances within the institution or elsewhere in the Division." *Id.* at C–6.[10]

10. "Normal capacity" is defined by the American Justice Institute (and by the defendants themselves) as

"that population which an institution can properly accommodate on an average daily basis. It represents that population which best utilizes the resources currently available. It should include some vacant beds, to accommodate population surges, and to allow for different classifications of inmates within institutional totals. It does not necessarily represent the fullest possible use of the plant, given virtually unlimited program and staff resources. Such a figure might be termed maximal capacity. While tempted,

## VI. *THE REMEDY*

This Court has been consistently reluctant to intervene in the overcrowding crisis which has existed in the Florida Prison System for at least the last three years, during which period the defendant Wainwright has closed the prison system to further entrants on three occasions. However, now that the evidence is clear that the Governor of the State of Florida has issued strict orders to the defendant Wainwright that he not refuse to accept further inmates, this Court cannot decline to act. The overwhelming evidence points toward blatant deprivations of the plaintiffs' constitutional rights, which the State of Florida has been unwilling to rectify.

Therefore, this Court concludes that it must require the defendants to reduce, by stages, the inmate population of the Division of Corrections down to emergency (that is, "crisis" overcrowding) capacity within one year of the date of this injunction and down to normal capacity by December 1, 1976.

The evidence before the Court as of May 12, 1975, indicates that the inmate population of the Division of Corrections is approximately 2,682 above emergency capacity. The testimony by the defendant Wainwright at the trial of this cause on May 12, 1975, indicates that the Division of Corrections has gradually increased the "emergency capacity"[11] by the use of innovative techniques, including the use of tents, for which the defendant Wainwright is

we did not indulge in the fantasy of establishing that figure for the FDC institutions we surveyed." *Id.* at C–6.

11. By the definition of "normal capacity" noted in footnote 10, it cannot be determined that the defendant Wainwright has increased the "normal capacity" contemporaneously with "emergency capacity" because much of the increased capacity has been obtained by the use of doublebunking, etc., which does not contribute to the "best utilization of resources currently available", as that term is defined.

to be highly commended. Therefore, this Court shall frame its injunction in terms of "emergency capacity" rather than a fixed number of inmates. In addition, the construction of additional facilities in the spring of 1976 will increase the Division of Corrections' normal capacity by 2,110 inmates. By using the concepts of "emergency" and "normal" capacity instead of a fixed number of inmates, this Court hopes to provide a continuing incentive to the Division of Corrections to maintain its pertenacious program of developing further innovations to increase the capacity of the Florida penal system.

The reason the Court is giving the Division of Corrections a full year to reduce the inmate population down to emergency capacity is that, as previously stated, that time period will coincide with the construction of new facilities by the spring of 1976 which will provide housing for an additional 2,110 inmates and thereby increase emergency capacity.

This Court wishes to make it clear, however, that this injunction will not place an insuperable burden upon the defendants. There are numerous means by which the inmate population may be reduced. One of these is Section 944.29 of the Florida Statutes which allows the Division of Corrections to "allow, in addition to time credits, an extra good time allowance for meritorious conduct or exceptional industry." The defendant

Wainwright, in his April 27, 1973, deposition, has construed that statute, upon advice of counsel, to mean that he could grant 60 to 90 days lump sum gain time. However, the statute on its face does not set forth any time limitation, thus allowing the Division of Corrections greater flexibility in granting earlier mandatory releases based upon the awarding of lump sum gain time.

In addition, the Florida Parole and Probation Commission could accelerate the granting of paroles. This would not mean that dangerous inmates would be precipitously released upon the streets since, by the defendant Wainwright's own testimony, 30% to 50% of the inmate population could be returned to free society, by parole or otherwise, without any danger to the community. Wainwright deposition, April 27, 1973, pp. 14–16. Furthermore, greater use of pre-trial intervention programs for so-called "victimless crimes" could provide relief at the other end of the criminal justice system in the State of Florida. Finally, the State of Florida can simply construct or lease additional facilities. In any event, this Court commits to the discretion of the defendants and the other high officials of the State of Florida the means by which the capacity of the Florida Prison System can be increased and by which the unconscionably severe overcrowding can be reduced.[12]

12. In *Gates v. Collier*, 349 F.Supp. 881 (N. D.Miss.1972), *aff'd* 501 F.2d 1291 (5th Cir. 1974), the District Court provided in its permanent injunction as follows:

. . . Without undertaking to dictate or limit the nature or content of long-range plans, the court suggests that areas of study should include at least the following:

 (a) The feasibility of reducing the inmate population at Parchman by alternatives to incarceration, such as:

 1. The housing of certain classes of inmates (e. g., first offenders, women prisoners, and inmates convicted of non-violent crimes)

at locations other than Parchman, including the possibility of arrangements with other state or federal penitentiaries, or instituting community-based facilities within Mississippi to house these prisoners.

 2. Instituting a system of halfway houses to house inmates who have been convicted of minor offenses or certain types of first offenders.

 3. Increased utilization of work-release, parole, and probation programs.

*Id.* at 903–904.

## VII. *"TENT CITY"*

On May 13, 1975, the Division of Corrections began to house some of the inmates entering the prison system in 20 tents designed to hold 10 men each at the athletic field adjacent to the Florida State Prison at Starke. The plaintiffs seek to enjoin the use of these tents on the grounds that it constitutes cruel and unusual punishment under the Eighth Amendment. However, the plaintiffs have not demonstrated, by one iota of evidence, that such tents provide inadequate housing for the inmates incarcerated therein. Their sole allegation is that the use of the tents symbolizes the "bankruptcy" of the criminal justice system in Florida. Symbol or not, the use of these tents, in the Court's view, represents a highly innovative step for which the defendant Wainwright is to be commended.

The tents are Florida National Guard tents. Each tent is 20' × 30' and houses 10 men, each of whom sleeps on a cot. They have plywood floors and are netted for mosquitos. Bathroom facilities are located in nearby recreation facilities. The inmates housed in the tents eat their meals in the Florida State Prison staff dining room. The tents are designed for minimum and medium custody inmates and the tents are surrounded by a double-fenced barbed wire perimeter which separates these inmates from maximum security inmates. The tent inmates are transient inmates awaiting classification who remain in these tents for no longer than two weeks. The tent inmates are allowed free mobility within the perimeter 24 hours a day so that, in effect, they have much more freedom than inmates housed in more permanent facilities. The tents are claimed to be weatherproof and sanitary. Under these circumstances, this Court could not properly enjoin the use of these tents as a means of housing inmates. On the contrary, the use of these tents is a sensible practical solution to an extremely critical problem.

## VIII. *THREE–JUDGE COURT UNNECESSARY*

Section 839.21 of the Florida Statutes provides as follows:

Any jailer or other officer, who willfully refuses to receive into the jail or into his custody a prisoner lawfully directed to be committed thereto on a criminal charge or conviction, or any lawful process whatever, shall be guilty of a misdemeanor of the first degree, punishable as provided in § 775.082 or § 775.083.

The defendants contend that a three-judge court would be necessary under 28 U.S.C. § 2281 and 28 U.S.C. § 2284 to grant this preliminary injunction since the injunction would, in effect, be restraining the action of a state officer in the enforcement of the above-quoted statute.

This contention borders somewhat on the frivolous. First of all, the plaintiffs have not questioned the *constitutionality* of the above-mentioned statute, which is the *sine qua non* for the applicability of the three-judge court statute. Second, there is no pending state prosecution againt the defendant Wainwright or any other defendant, or any threat thereof. Third, this Court has not and will not require the defendant Wainwright to refuse to accept prisoners lawfully committed to his custody. He may use whatever means within his control, consistent with his constitutional and statutory obligations, to comply with this Court's injunction.

The defendants also contend that this Court would be enjoining the functioning of the bundle of state statutes, regulations and rules of criminal procedure which comprise the state criminal justice system, thereby requiring the convening of a three-judge court. This argument too must fail. First of all, the plaintiffs have not challenged the *constitutionality* of Florida's criminal justice system. They have merely challenged the unconstitutional conditions of con-

finement in the Florida Penal System which operates to deprive the plaintiffs of the basic elements of adequate health care and subject them to danger to life and health. Second, the unimpaired administration and operation of the criminal justice system of the State of Florida is in no way inconsistent with the humane treatment of incarcerated prisoners. The providing of minimally adequate housing and medical care to sentenced inmates is independent of the efficient operation of the criminal justice system. The state's criminal justice system may operate to place as many convicted persons as the state courts permit in its jails and prisons. All that must be done is to provide minimally adequate health care and housing to those persons who are incarcerated because of the functioning of the system. In fact, it seems clear to this Court that, in the long run, providing decent medical care and housing to inmates would serve to promote the rehabilitative goals of the criminal justice system so as to permit their re-entry into free society as upright and law abiding citizens and to prevent their re-entry into the criminal justice system. On this basis, this Court can see no restrictive effect whatsoever on the operation of the criminal justice system and, in fact, envisions its enhancement thereby. As in the case of *Newman v. Alabama,* 503 F.2d 1320 (5th Cir. 1974), *cert. den.* 421 U.S. 948, 95 S. Ct. 1680, 44 L.Ed.2d 102 (1975), where three-judge court jurisdiction was rejected, the Florida correctional system "is not governed by any uniform practice or procedure in the administration of medical care, beyond the purported uniform practices of neglectful treatment dispensed at the various prison locations throughout the state." *Id.* at 1327. Similarly, although all the correctional institutions in Florida are severely overcrowded, there is no uniform pattern of the effects of said overcrowding at each institution. In addition, at each institution, various measures have been taken to alleviate overcrowding which are uniquely appropriate to each.

 Also, as in *Newman, supra,* and, as already indicated, this preliminary injunction will not "eviscerate" or affect any state regulations, statutes or rules of criminal procedure. Therefore, this Court concludes that this injunction is properly issued by a single district judge.

## IX. *ABSTENTION INAPPROPRIATE*

Finally, the defendants contend that this Court should abstain pending disposition of certain state mandamus actions which were filed in the Circuit Court of Leon County, Florida, and which challenge the defendant Wainwright's former actions in refusing to accept further inmates into the state prison system in order to alleviate the crisis overcrowding. Although this contention, too, is patently without merit, a brief treatment seems appropriate.

 First of all, the instant consolidated cases have been pending for over three years. The renewal of the application for preliminary injunction is based on a motion filed in March 1973, which motion had never been ruled on. The state mandamus actions were not filed until December 1974. Since this Court acquired jurisdiction of this cause long before the state mandamus actions, abstention would be highly inappropriate. In the early case of *Taylor v. Taintor,* 83 U.S. (16 Wall.) 366, 21 L.Ed. 287 (1873), the Supreme Court of the United States held that:

Where a state court and a court of the United States may each take jurisdiction, the tribunal which first gets it holds it to the exclusion of the other, until its duty is fully performed and the jurisdiction invoked is exhausted and this rule applies alike in both civil and criminal cases. *Id.* at 370.

This well-established principle has been applied in two recent Fifth Circuit cases. *Polk v. State Bar of Texas*, 480 F. 2d 998 (5th Cir. 1973); *Duke v. State of Texas*, 477 F.2d 244 (5th Cir. 1973).

Second, a state court construction of the defendant Wainwright's duty to accept sentenced prisoners is not relevant to the cases *sub judice* since this Court has not and will not require the defendant Wainwright to refuse to accept those lawfully committed to his custody. Therefore, this Court will not abstain.

## X. *CONCLUSION*

This Court, in the three years that these cases have progressed, has come to the growing realization, through expert testimony and documentary evidence that severe crisis overcrowding creates violence, brutality, disease, bitterness, and resentment as to both inmates and correctional staff. In addition, severe overcrowding in the prison system tends to perpetuate antisocial behavior and foster recidivism so as to ultimately disserve the rehabilitative goals of the correctional system. A free democratic society cannot cage inmates like animals in a zoo or stack them like chattels in a warehouse and expect them to emerge as decent, law abiding, contributing members of the community. In the end, society becomes the loser.[13]

Therefore, it is

Ordered and adjudged:

That the plaintiffs' renewal of application for preliminary injunction to close prisons to additional entrants, filed herein April 21, 1975, is hereby granted to the limited extent set forth below; and, it is further

Ordered and adjudged:

That, within one year of the date of this order and preliminary injunction, the defendants are hereby required to reduce the overall inmate population of the Florida Division of Corrections (or its successor agency, if any) to "emergency capacity" (as that term is defined by the 1972 Technical Assistance Report prepared for the Florida Division of Corrections by the American Justice Institute entitled "Overcrowding in the Florida Prison System") in the following stages:

(a) Within *90 days* of the date of this order and preliminary injunction, the inmate population of the Florida Division of Corrections shall be reduced to *2,000 inmates* above "emergency capacity".

(b) Within *150 days* of the date of this order and preliminary injunction, the inmate population shall be reduced to *1,500 inmates* above "emergency capacity".

(c) Within *210 days* of the date of this order and preliminary injunction, the inmate population shall be reduced to *1,000 inmates* above "emergency capacity".

(d) Within *270 days* of the date of this order and preliminary injunction, the inmate population shall be reduced to *500 inmates* above "emergency capacity".

(e) Within *365 days* of the date of this order and preliminary injunction, the inmate population shall be reduced to *"emergency capacity"*.

The use of the term "reduce" shall not be construed so as to limit the defend-

13. The Court is clearly of the opinion that the four prerequisites to the issuance of a preliminary injunction have been satisfied in that: (1) the plaintiffs have demonstrated that there is at least a substantial likelihood that th y will prevail on the ultimate merits; (2) there is a substantial threat that the plaintiffs will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiffs far outweighs the threatened harm the injunction may do to the defendants; and (4) granting the preliminary injunction will not disserve the public interest but will in fact advance the public interest. *Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

ants' right to increase the so-called "emergency capacity" of the Division of Corrections by constructing or leasing additional facilities for the housing of inmates committed to the custody of the Florida Division of Corrections so long as the number of inmates above the so-called "emergency capacity" is being reduced in compliance with this order and preliminary injunction; and, it is further

Ordered and adjudged:

That, by December 1, 1976, the defendants shall reduce the overall inmate population of the Florida Division of Corrections to "normal capacity", that is, that population which the institutions of the Florida Division of Corrections can properly accommodate on an average daily basis. The term "reduce" shall not be construed to limit the defendants' right to construct or lease additional facilities for the housing of inmates committed to the Florida Division of Corrections in order to increase "normal capacity"; and, it is further

Order and adjudged:

That, at every stage of reduction set forth above, the defendant Wainwright shall submit, to the Court and all counsel, a report which shall include the following information:

(a) The overall population of the Florida Division of Corrections subdivided by institution.

(b) The so-called "emergency capacity" of the Florida Division of Corrections subdivided by institution.

(c) The so-called "normal capacity" of the Florida Division of Corrections subdivided by institution.

(d) The steps being taken to reduce the inmate population of the Florida Division of Corrections.

(e) The steps being taken to increase the capacity of the institutions of the Florida Division of Corrections.

(f) A statistical breakdown of the number of inmates committed to the custody of the Florida Division of Corrections categorized by the particular crime for which each inmate is sentenced (*i. e.*, robbery, burglary, etc.) ;

and, it is further

Ordered and adjudged:

That the plaintiffs' *ore tenus* motion to enjoin the use of tents as a means of housing inmates of the Florida Division of Corrections, made in open court on May 12, 1975, is hereby denied; and, it is further

Ordered and adjudged:

That the defendants are hereby enjoined from housing more than one inmate in each of the one-man cells at the Lake Butler Reception and Medical Center; and, it is further

Ordered and adjudged:

That the defendants are hereby required to give to each inmate committed to the custody of the Florida Division of Corrections a bed upon which to sleep; and, it is further

Ordered and adjudged:

That the defendants' motion for three-judge court, filed herein May 12, 1975, is hereby denied; and, it is further

Ordered and adjudged:

That further proceedings in the trial of these cases, which were to resume May 19, 1975, are HEREBY RESET at 9:30 A.M., Monday, June 16, 1975, in Court Room No. 2, Fifth Floor, United States Court House and Post Office Building, 311 West Monroe Street, Jacksonville, Florida; and, it is further

Ordered and adjudged:

That the foregoing order and preliminary injunction and opinion constitutes this Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

Appendix to follow.

APPENDIX

*EXHIBIT "A"*